Per Curiam: :
This case was referred to Trial Commissioner Franklin M. Stone with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on January 27,1967. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On March 17,1967, defendant filed a motion to dismiss wherein it is urged that the court adopt in toto the report of the commissioner with the petition to be dismissed accordingly, to which plaintiff has filed no response. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiff is therefore not entitled to recover and the petition is dismissed.
OPINION OE COMMISSIONER*
Stone, Commissioner:
Plaintiff, a civilian employee of the Navy who served as the Government’s inspector at a *222 Naval and Marine Training Center under construction at Reading, Pennsylvania, for a period of about 15 months beginning in June 1958 and ending in September 1959, brings this action to recover 400 days per diem, in addition to 30 days allowed him, for the time he was at Reading.
Plaintiff contends that during his entire stay at Reading he was there on temporary assignment only and that, therefore, he is entitled to per diem for the full period under the Travel Expense Act of 1949, 63 Stat. 166., as amended, 5 U.S.C. §§ 836, 837. While plaintiff’s position is based on the twin contentions that he was never advised, either orally or in writing, that his assignment to Reading was permanent, the principal ground upon which he relies is the undisputed fact that he was not officially advised in writing that his assignment was permanent, as required by District Public Works Office Instruction (D.P.W.I.) 12340.2. This instruction, entitled “Reassignment of Construction and Inspection Personnel”, was issued by the District Public Works Officer, Fourth Naval District, IT.S. Naval Base, Philadelphia, Pennsylvania, under date of April 26, 1956, and reads in pertinent part:
3. Policy. All Construction and Inspection personnel in the ratings of * * * or Inspector are employed subject to assignment to any construction site within the Fourth Naval District where their services may be required. The Manager, Construction and Inspection Branch, is delegated the authority to assign individual employees to the various construction sites as he deems necessary * * *. In assigning an employee to a construction site outside the commuting area in which his current duty station and residence are located, the following shall apply:
a. For assignments of short duration (usually two months or less), temporary additional duty travel orders will be issued and the employee shall be reimbursed for transportation and per diem subsistence.
b. For assignment of extended duration' (usually two months or longer), the employee will be officially reassigned to the new duty station. * * * Further allowance for travel or per diem expense incidental to the change in duty station shall not be permitted after the date of official reassignment.
4. Action.
a. The Manager, Construction and Inspection Branch, is authorized to and will issue a letter to each employee *223 reassigned, as far in advance as practicable. This letter will set forth the effective date of assignment and will repeat the conditions regarding transportation, etc., which were discussed with the employee previously. One copy of such letter will be forwarded to the Personnel Branch for incorporation in employee’s personnel jacket.
b. Personnel action forms to effect official reassignment will be prepared by the Personnel Branch.
Plaintiff argues that the admitted failure of the District Public Works Office to comply with said Instruction and certain regulations set forth in the Naval Civilian Personnel Instruction (N.C.P.I.) 240 (see finding 16, infra), had the effect of continuing plaintiff’s status of temporary assignment to Eeading and voids any possibility that he was permanently assigned there. Plaintiff’s position raises questions of fact and law which will be discussed in that order.
The credible testimony and other evidence in the record show that the controlling factual issues must be resolved against plaintiff. The facts are set forth in the accompanying findings and will be summarized only to the extent considered essential to a proper understanding of plaintiff’s theory of recovery.
In 1958, plaintiff was a construction inspector assigned to the District Public Works Office of the Fourth Naval District headquartered at the U.S. Naval Base, Philadelphia, Pennsylvania. He was then stationed at Lake-hurst, New Jersey, and subject to assignment to any construction site within the Fourth District. Sometime early in 1958, plaintiff received a telephone call from his superior, Mr. Jesse P. Larrimer, Manager of the Construction and Inspection Branch of the District Office, who advised that the District was going to build a Naval and Marine Corps Training Center at Eeading, Pennsylvania, that it would take approximately a little more than a year to complete construction of the Center, and that the District Office was contemplating transferring plaintiff to that duty station. Thereafter, plaintiff was transferred to Philadelphia on an interim basis for familiarization and briefing relative to the new construction project.
At that time, the usual policy of the District was to afford its inspectors 2 weeks of per diem to meet transitional ex *224 penses when transferred to a new post of duty, providing they were not going to commute. During a discussion between plaintiff and Mr. Larrimer concerning the subsistence expenses that would be allowed plaintiff incidental to his assignment to Eeading, Mr. Larrimer informed plaintiff that he would be assigned there for a 2 week orientation period under temporary duty travel orders; that, consistent with normal policy, he would be allowed per diem for this period of time; and that, after the expiration of such period, he would be reassigned to Reading on a permanent duty basis as the resident inspector at the Center for the duration of construction. Plaintiff expressed dissatisfaction with these arrangements, indicated the belief he was entitled to more than 2 weeks per diem because his expenses would be greater at Reading than in Philadelphia where, as a bachelor, he lived with a relative, and requested a higher authority decision on this matter.
In accordance with plaintiff’s request, a meeting was arranged and held sometime prior to June 10, 1958, which'was attended by Captain W. W. Moore, Jr., then Deputy District Public Works Officer, the Director of the Administrative Division of tire District (administrative officer), Mr. Lar-rimer, and plaintiff. After considering plaintiff’s complaints and request that the 2 week per diem period be increased to the maximum allowable, Captain Moore decided to extend plaintiff’s orientation period from 2 weeks to 1 month. He confirmed the advice previously given to plaintiff that he would be assigned as the resident construction inspector of the Center project at Reading for the duration of the job, and advised plaintiff that he would be allowed 80 days per diem in connection with this assignment. Captain Moore also advised plaintiff that after the expiration of the 30 day period provided in the travel order to be issued to him, his assignment would become permanent and he would be permanently reassigned to the project at that place.[1]
On June 10, 1958, subsequent to the meeting in Captain Moore’s office, Captain Moore signed a travel order which *225 was delivered to plaintiff prior to his departure for Reading. The order was a single-trip type order, i.e., a temporary duty travel order, which showed that the purpose of the travel authorized was in connection with construction of a new training center under a certain numbered contract, that plaintiff was to travel from Philadelphia to Reading “& RETURN” for an estimated 30 days duty, including travel time, that the travel was to be accomplished by July 20,1958, and that $12 per diem was authorized, the total cost of this item being estimated at $360.
Plaintiff departed from Philadelphia on the same afternoon he received his travel orders and on the following Monday morning he reported for duty at Reading, where he remained until about the middle of September 1959.
On July 8, 1958, about 2 weeks before the July 20, 1958, expiration date of plaintiff’s travel order, he had a conversation with Captain N. J. Drustrup, then the District Public Works Officer, who was in Reading in connection with a ground breaking ceremony held at the new training center construction site. While plaintiff denied on the witness stand that he was advised or knew that he would be kept on the project permanently, he admitted that he “suspected” this would 'be done and that he had indicated an awareness of such a possibility to Captain Drustrup during their talk. Plaintiff presented testimony found to be incredible that in response to a specific question as to whether he was to remain at Reading, Captain Drustrup stated “You drop me a line.” The record clearly shows that at the time of this conversation plaintiff more than suspected that he was to remain at Reading permanently — plaintiff knew this to be a fact. Plaintiff indicated to Captain Drustrup only that he was entitled to an additional 30 days per diem because his living expenses at Reading were higher than when he was residing in Philadelphia, and requested that he be given subsistence for another 30 days. Captain Drustrup’s suggestion that plaintiff write to him was directed solely to plaintiff’s request for more subsistence and did not relate to an asserted inquiry by plaintiff as to whether he was to be kept on the project at Reading. The foregoing conclusions are strongly supported by a letter sent to Captain Drustrup under date of July 22,1958 (postmarked July 23, 1958), in which plaintiff referred to their *226 conversation on July 8 . re my getting an additional 30 days subsistence” and stated that as “previously explained” he felt entitled to this additional subsistence because “the cost of living out of town is so much higher than when you are living at home.” Also, he gave as another reason why his request should be granted, the fact that he knew “from past experiences other branches of the United States Government service grants a man when he transferred from one point to another point the minimum of 60 (sixty) day [sic] subsistence” (emphasis supplied). (See finding 10, infra.)
A daily log book maintained by plaintiff on the job site at Reading contains an entry made by him which reads “Informed Mr. Larrimer my thirty (30) days are up at Reading, Pa. 7/16/58”. Plaintiff testified that he included in his weekly report a handwritten letter addressed to Mr. Larri-mer advising him as indicated in this log entry. Defendant denies any knowledge of such a communication and there is no documentary or other corroborating evidence in the record that plaintiff actually sent the letter as claimed. In any event, even if plaintiff did send the letter, the log entry and letter show, at most, that plaintiff alerted his superior only to the fact that the 30 day temporary duty travel order issued to plaintiff had expired. Such evidence does not constitute proof that plaintiff had not been told his assignment to Reading was permanent, the crucial factual issue here. Indeed, plaintiff does not contend otherwise, and he refers to the log entry and letter in his brief to make the point that he gave notification when the original 30 days had expired and that upon receipt of such notice, Mr. Larrimer should have taken some action to make plaintiff’s assignment permanent, if such was the intent of the District Public Works Office.
The evidence shows that sometime in the summer of 1958, probably subsequent to plaintiff’s conversation with Captain Drustrup in Reading on July 8,1958, Mr. Paul R. O’Donnell, the Assistant District Public Works Officer for Construction, visited the training center job site for the purpose of checking on the construction project; that on this occasion 'he talked with plaintiff and told him he was going to remain at Reading until the job there was completed; that plaintiff expressed unhappiness with his assignment because it was cost *227 ing him so much more to live at Reading than in Philadelphia; that plaintiff indicated he had unsuccessfully tried, through his immediate superior, to obtain additional subsistence ; that he was appealing the denial of his request to higher levels of authority; and that O’Donnell advised he would check on this matter upon his return to Philadelphia. In connection with the foregoing, it is considered significant to note that during the course of his testimony, plaintiff never mentioned this conversation with O’Donnell. Moreover, he stated that subsequent to July 1958, he had never inquired of anyone, other than Captain Drustrup, how long he was going to remain at Reading, and that he was never told by anyone that he was permanently assigned there. Such testimony is rejected as unbelievable in light of the credible testimony presented by Mr. O’Donnell.
Upon Mr. O’Donnell’s return to the District Public Works Office headquarters in Philadelphia, he talked with various officials and drafted a letter, which Captain Drustrup signed and sent to plaintiff at his last known address, the Penn-Plaza Hotel in Reading, under date of August 6,1958. This communication refers to plaintiff’s letter of July 22, 1958, and states, in part, “. . . once it has been determined that an employee sent to a permanent assignment is going to remain there, the continuance of further subsistence cannot be justified. Your work has been completely satisfactory at Reading, and it is our present intention that you will remain there for the duration of the contract. Under these circumstances, it will not be possible to extend your subsistence for more than the initial thirty (30) day period.”
Plaintiff testified that he never received the above letter. A wealth of authority could be cited for the proposition that there is a strong presumption that a properly addressed letter, deposited in the United States mails with postage duly prepaid, has been received by the addressee in the ordinary course of the mail. However, such a presumption is rebut-table. Considering, among other things, that the letter was addressed to plaintiff at a hotel, that he had moved therefrom before the letter was sent, that he had not left a forwarding address, and that he testified that on one occasion after he left the hotel he went back for mail and found none, it appears that a reasonable argument could be made that *228 this presumption has been rebutted in the instant case. Moreover, defendant does not rely on the presumption in its brief. In view of the foregoing and that whether plaintiff did or did not receive this letter is not determinative of the decision in this case, plaintiff is given the benefit of the doubt and it will not be presumed that he received the letter in question. However, the finding that the letter was sent is significant because the contents thereof support the conclusion that plaintiff was seeking additional per diem rather than clarification of his duty status, and confirm the position consistently maintained by defendant that plaintiff was sent to Reading on permanent assignment for the duration of the job.
Plaintiff suggests the possibility that he was assigned to temporary duty at Reading pending a determination by the District Public Works Office of his eligibility and competency to be assigned there permanently, since he had not been on independent duty before. In indirect support of this theory, plaintiff argues that the words in the letter “. . . it is our present intention that you will remain there [at Reading] for the duration of the contract” indicate that as of the time of the letter, a final determination had not been made with respect to plaintiff’s status and that he was simply being alerted to the fact that his assignment would be made permanent. The aforestated possibility and argument are not supported. by the evidence. Considering the record as a whole and particularly the testimony of Mr. O’Donnell, it is clear that while one of the purposes of his visit to Reading was 'to ascertain whether plaintiff was performing his duties in a satisfactory manner, O’Donnell did not check on plaintiff’s work for the purpose of determining whether he should permanently be assigned to the job and that O’Donnell understood that plaintiff was permanently assigned to the project for the duration and was not there on a trial basis.
Despite the fact that plaintiff was sent to Reading on permanent assignment, it can not be seriously disputed that he could have been recalled from there at any time. It is quite obvious from Mr. O’Donnell’s testimony that the statement in the August 6, 1958, letter to the effect that it was the “present intention” of the District Office to keep plaintiff on the job for the duration of the project, was simply made as *229 a “hedge” in the event he “went sour and started to do a very-poor job of inspection”, in which case plaintiff undoubtedly would have been relieved and replaced.
It is undisputed that early in June 1959, plaintiff received a telephone call at Reading from his immediate supervisor who asked him if he ever received a letter transferring him to Reading, to which inquiry plaintiff replied in the negative. It is also undisputed that plaintiff was relieved of his assignment at Reading about the middle of September 1959, by oral instructions given to him by a representative of the District Public Works Office who told him to return to Philadelphia, and that plaintiff did not receive a written notification that his assignment at Reading was completed. It does not appear that a travel order was issued covering plaintiff’s return trip from Reading to Philadelphia, or that he was given or claimed any allowance for transportation back to Philadelphia. Defendant admits that plaintiff was never advised in writing that his assignment to Reading was made permanent; that plaintiff’s personnel jacket contains no record of any such notification or any other written notice of a change in duty station to Reading; and that through inadvertence, the District Office failed to send plaintiff a memorandum form notice of permanent reassignment to Reading after the expiration of the original travel order issued to him, as required by paragraph 4a. of District Public Works Instruction 12340.2, supra.
Plaintiff was on the job at Reading for a period of 460 days. He received per diem in lieu of subsistence for 30 of these days at the rate of $12 per day, totaling $360. Subsequent to plaintiff’s return to Philadelphia from his assignment at Reading, he filed a supplemental claim for 400 days per diem at the above rate, totaling $4,800. This claim was denied by the Department of the Navy and this suit followed.
In support of his contention that he was never told, either before his departure from Philadelphia or after his arrival at Reading, that the assignment to Reading was permanent, plaintiff relies heavily on the fact that he was sent there on temporary duty travel orders which did not indicate a permanent reassignment; that a written notice of permanent reassignment was not sent to him by the Personnel Depart *230 ment of the District Office; that no order for change of duty-station was placed in his personnel jacket; and that, according to his own testimony, he was never officially or unofficially advised, either orally or in writing, of his change in duty status. This argument is rejected as unpersuasive. Despite the type of travel orders issued to plaintiff and the lack of documentary evidence showing that he was ever reassigned to Eeading, it is clear from highly credible testimony that plaintiff was definitely orally told, prior to his departure from Philadelphia, that he was being sent to Eead-ing on permanent assignment for the duration of the job, and that after his arrival there, he was given to understand, and understood, that he was on permanent assignment there.
We now turn to a discussion of the legal issues raised by plaintiff.
The testimony shows that the reason a written notice of permanent reassignment to Eeading was not given to plaintiff prior to his departure from Philadelphia, pursuant to paragraph 4a. of D.P.W.O. Instruction 12340.2, supra, was because administrative officials of the District Office were aware of “decisions” rendered 'by the Comptroller General laying down the rule to the effect that “. . . an employee may not be allowed per diem in lieu of subsistence at a place where he is on temporary duty after he receives notice that such place is to become his permanent duty station . . .”. See 30 Comp. Gen. (B-96669), 94,95 (1950), partially quoted in finding 14, infra, which also states in pertinent part:
. . . the above rule [with respect to how formal the notice of permanent reassignment must be] has never been confined to the date of the employee’s receipt of a formal or written notice of the change of his official station, it being sufficient that the employee actually knew officially that his temporary place of duty was to become his permanent duty station. However, the notice to the employee not only must be communicated to him by proper authority but should be definite as to the action being taken so as to leave no doubt in the employee’s mind with respect thereto.
It is quite clear that in view of the above cited decision of the Comptroller General, the District Office concluded no per diem could be paid to plaintiff subsequent to the issuance of a formal reassignment notice; and that in order to assist *231 plaintiff financially to defray transitional expenses incidental to bis transfer, it was decided to send plaintiff to Heading on temporary duty travel orders for an orientation period of 30 days and to issue a notice of permanent reassignment upon tbe expiration of tbis period. In other words, notice of permanent reassignment was not issued to plaintiff before bis departure from Philadelphia because administrative employees of the District Office realized such action would preclude him from receiving the per diem which he actually received by reason of the temporary travel order issued. There is no question that administrative officials of the District Office also knew that prevailing policy instructions issued by the District Officer i.e., paragraph 4a. of D.P.W.O. Instruction 12340.2, supra, required that plaintiff be advised by letter of his permanent reassignment, and that the District Office planned to send an appropriate notification to him after the expiration of his travel orders but neglected to do so.
Plaintiff’s principal position appears to be that even if he was orally told that he was being sent to Heading on permanent assignment, he is still entitled to recover on the grounds that officials of the District Office both violated and failed to comply with certain regulations set forth in the Naval Civilian Personnel Instruction (N.C.P.I.), and the policy outlined in D.P.W.O. Instruction 12340.2, supra.
Plaintiff first asserts that the controlling law in this controversy is the Travel Expense Act of 1949, supra, that this law has been implemented by the Department of the Navy through N.C.P.I. 240 (pertinent sections of which are set forth in finding 16, infra); and that the administrators of the Navy and civilian employees must both abide and be guided by the regulations in N.C.P.I. 240. Plaintiff asserts that under these regulations a permanent change in duty status carries with it no right to per diem; that temporary duty travel orders under which plaintiff was entitled to obtain per diem for 30 days should not have been issued when it was known by administrative officials of the District Office that the decision had been made to make his assignment permanent; that travel orders for temporary duty may be prolonged past the original estimated date, and that when this is done, the issuing authority is required to review the situation from month to month and make a de *232 termination with respect to what status should be given to a particular employee; that plaintiff had a right to assume that his status was known to the District Office and that it was under review, but that he went beyond this and sent a notification when his original 30 days had expired; and that upon receipt of such notification, action should have been taken to make plaintiff’s assignment permanent, if that was the intent of the District Office. While the foregoing facts are substantially correct, it does not necessarily follow that plaintiff is entitled to recover here.
Plaintiff next asserts that the D.P.W.O. Instruction 12340.2, supra, was the local implementation of N.C.P.I. 240 and the Travel Expense Act, supra, and argues that said Instruction had the force of an official regulation; that the District Office should not be permitted to ignore said Instruction and policy announced therein because it was aware of the Comptroller General’s opinion, mentioned earlier, or be allowed to act on some other such opinion in contradiction to its own stated policy; and that, most importantly, the Comptroller General’s said opinion was not considered by the District Office when the Instruction was drafted.
In rejecting the foregoing arguments as not controlling here, it should be kept in mind that while paragraph 4a. of said Instruction directs that a letter setting forth certain information be issued to each employee reassigned and that a copy of such letter be forwarded to the Personnel Branch for incorporation in the employee’s personnel jacket, paragraph 3b. states, in part: “For assignment of extended duration (usually two months or longer), the employee will be officially reassigned to the new duty station. . . . (Further) allowance for . . . per diem expense incidental to the change in duty station shall not be permitted after the date of official reassignment”, and that it has been found as a fact that plaintiff was sent to Beading for the duration of the job which was expected to last more than a year. Considering the foregoing, the District Office could not possibly have retained plaintiff on temporary duty during his entire stay at Beading and allowed him per diem for all of the time he was there.
Plaintiff next argues that his exact status must be considered before the above-mentioned decision or any other such decision of the Comptroller General can be applied; *233 that if plaintiff was not on temporary duty but was told before leaving Philadelphia that his assignment was permanent, then the District Office committed error in issuing temporary travel orders to plaintiff and allowing him any per diem because, under controlling regulations and past decisions of the Comptroller General, plaintiff’s post of duty would change on the date he arrived at Beading (citing 5 Comp. Gen. 337).
In light of the fact that the District Office knew plaintiff was being sent to Beading on permanent assignment, it would appear, without deciding, that the action in issuing temporary travel orders to plaintiff for the purpose of allowing him per diem was wrong. However, whether Government personnel wrongly circumvented the Comptroller General’s opinion and other regulations of the Navy by issuing temporary duty travel orders to plaintiff is not the critical issue for decision here.
Finally, plaintiff asserts that the Comptroller General’s decision in question does not state what oral notice would be sufficient to constitute official notice, and argues that the facts concerning the notice given to plaintiff here are such that the Comptroller’s decision is not applicable or controlling with respect to the instant case. This argument is rejected as not being supported by the evidence in the record.
Defendant is correct in arguing that there is no requirement in law that a change of permanent assignment must be in writing. In my opinion, plaintiff’s action should fail on the grounds stated in the decision of the Comptroller General (30 Comp. Gen. 94-95 (1950), supra) — that despite the failure of plaintiff to receive a formal written communication notifying him that he had been permanently reassigned to Beading, he was given definite oral notice of such fact by proper authority, and this notice was sufficient to make his status permanent.
Although this court on occasion has disagreed with decisions of the Comptroller General (see Hearne v. United States, 107 Ct. Cl. 335, 395, 68 F. Supp. 786, 788-789 (1946), cert. denied, 331 U.S. 858 (1947); Day v. United States, 123 Ct. Cl. 10, 22, 104 F. Supp. 1005, 1010 (1952)), this above cited opinion appears clearly right and should be controlling in this case. It is true, as plaintiff contends, that failure by *234 an executive department to comply with its own regulations can invalidate its actions. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 266-67 (1954); Service v. Dulles, 354 U.S. 363, 372 (1957); Smith v. United States, 155 Ct. Cl. 682, 687, (1961); Sofranoff v. United States, 165 Ct. Cl. 470, 476-477 (1964); Starzec v. United States, 145 Ct. Cl. 25, 29-30 (1959); Watson v. United States, 142 Ct. Cl. 749, 754, 162 F. Supp. 755, 757 (1958); Newman v. United States, 143 Ct. Cl. 784, 792-794 (1958); Daub v. United States, 154 Ct. Cl. 434, 437, 292 F. 2d 895, 897 (1961); Murray v. United States, 154 Ct. Cl. 185, 191 (1961). But all of the above authorities are distinguishable in that they are discharge cases involving substantial non-compliance with regulations which greatly prejudiced plaintiffs therein and, in effect, denied them procedural due process.
For example, in Service v. Dulles, supra, the plaintiffs were dismissed not after consideration of the complete file, arguments, briefs and testimony presented, as the regulations provided, but on the basis of statements made by another official. In Sofranoff v. United States, supra, the defect was that the plaintiff there was not sent before a board of medical survey for a determination of his alleged unsuitability as required in the regulations. Imposition of a greater penalty than that provided in the Army manual was the offense in Daub v. United States, sufra, and consideration of evidence that the regulations proscribed was the violation in Murray v. United States, sufra. Finally, in Smith v. United States, supra, it was held that failure to comply with regulations involving substantial procedural rights such as notice of the contemplated action and the right to submit a signed statement required a reversal of the discharge.
Here, plaintiff has not been prejudiced by his failure to receive written notification of his permanent assignment. Given the finding that plaintiff received definite and clear oral notice from an authorized person, the lack of written communication becomes only a technical non-compliance with the regulations, a disruption more of internal housekeeping methods than a denial of a substantial right of plaintiff. As such, it should not have the effect of nullifying plaintiff’s permanent assignment. “It is not every deviation from specified procedure, no matter how technical or regard *235 less of its basic nature, that automatically serves to invalidate a discharge”. Greenway v. United States, 163 Ct. Cl. 72, 80 (1963). In that case, plaintiff’s discharge was effective the day he received his notice rather than the day after receipt of the notice as provided for in the regulations. This court refused to use this defect to overturn the discharge, 163 Ct. Cl. 72, 79. Also relevant is DeBusk v. United States, 132 Ct. Cl. 790 (1955), cert. denied, 350 U.S. 988 (1956). The regulations there required that charges served on the plaintiff by the agency had to be countersigned by the appropriate personnel official; although this official did advise and assist in the preparation of the charges, he did not countersign them. In holding for the defendant, the court stated: “[T]he omission of the personnel officer’s signature amounts in this case to no more than a technical violation of the regulation”, 132 Ct. Cl. at 796. Other cases in which minor infractions of applicable regulations did not nullify the action taken are Ciaffone v. United States, 126 Ct. Cl. 532, 538-539 (1953) and Queen v. United States, 137 Ct. Cl. 167, 172 (1956).
In sum, then, it seems quite clear that defendant should prevail on the grounds that plaintiff received adequate notice of his transfer, his failure to receive written notice to that effect being no more than a technical violation of the regulations having no prejudicial effect on plaintiff.
Plaintiff is not entitled to recover and his petition should be dismissed.
FINDINGS on Fact
1. At the time of the events hereinafter set forth, plaintiff, now retired, was a construction inspector assigned to the District Public Works Office of the Fourth Naval District (hereinafter sometimes referred to as the “District Public Works Office” or the “District Office”), the headquarters of which office was located at the U.S. Naval Base, Philadelphia, Pennsylvania. A condition of his employment was that he was subject to assignment at any construction site within the Fourth Naval District (sometimes hereinafter referred to as the “District”) where his services might be required.
2. In the early part of 1958, plaintiff was stationed at Lake-hurst, New Jersey. It appears from credible and acceptable *236 testimony, disputed by plaintiff, presented by Ms immediate superior, Mr. Jesse P. Larrimer, then Manager of the Construction and Inspection Branch of tbe District Office, that he telephoned plaintiff at Lakehurst and advised him that the District was going to build a Naval and Marine Corps Training Center at Beading, Pennsylvania, that it would take approximately a little over a year to complete construction of the Center, and that the District Office was contemplating transferring him to that duty station. Thereafter, plaintiff was transferred to Philadelphia for an interim period for familiarization and briefing relative to the new construction project, pending award of the contract therefor.
3. At that time, the usual policy of the District was to afford its Inspectors 2 weeks of per diem to meet transitional expenses when transferred to a new post of duty, providing they were going to actually incur such expenses by moving to another residence in the vicinity of their new station and not commute. Plaintiff was only allowed travel costs and no per diem when he was sent from Philadelphia to Lakehurst because his supervisor understood plaintiff planned to commute between these points each day. After his return to Philadelphia, plaintiff and Mr. Larrimer had a discussion concerning the subsistence expenses that would be allowed plaintiff incident to his assignment to Beading. It appears that Mr. Larrimer informed plaintiff to the effect that he would be assigned to Beading for a 2-week orientation period under temporary duty travel orders; that, consistent with normal policy, he would be allowed per diem for this period of time; and that after 2 weeks, he would be reassigned to Beading on a permanent duty basis as the resident inspector at the project for the duration of construction. Plaintiff expressed dissatisfaction with these arrangements, stated the belief that he was entitled to more than 2 weeks per diem because his expenses would be greater in Beading than in Philadelphia where he lived with a relative, and requested a higher authority decision on this matter.
4. Credible testimony, disputed by incredible testimony presented by plaintiff, shows that in accordance with plaintiff’s request, a meeting was arranged and held sometime prior to June 10,1958, in the office of Captain W. W. Moore, Jr., then the Deputy District Public Works Officer of the *237 District in Philadelphia, and that this meeting was attended by Captain Moore, Mr. Fred Fierami, then Director, Administrative Division, District Public Works Office of the Fourth Naval District (administrative officer), Mr. Larri-mer, and plaintiff. Rejecting plaintiff’s testimony that the above-mentioned meeting was never held, the unrcbutted and credible testimony of Messrs. Pierami and Larrimer establishes that during the course of the meeting, plaintiff took the position that he was entitled to more than 2 weeks per diem and requested the period be extended to the maximum allowable, because the assignment to Heading represented a hardship to him in that he could live cheaper in Philadelphia where, living as a bachelor, he could reside with relatives who were helping him defray expenses; that in support of his request for more liberal treatment, plaintiff complained that he had not been allowed subsistence expense during his extended assignment to duty at Lakehurst and as a result, he had been required to bear additional expense of living away from Philadelphia; that after considering plaintiff’s request and complaint, Captain Moore decided to extend plaintiff’s orientation period from 2 weeks to 1 month; that he confirmed the advice previously given to plaintiff that he would 'be assigned as the resident construction inspector on the Center project at Reading for the duration of the construction which would take more than a year; that he further advised plaintiff that he would be allowed 30 days per diem in connection with this assignment, and that after expiration of the 30 day period provided in the travel order, his assignment to Reading would become permanent and he would be permanently reassigned to the project at that place.
5. On June 10, 1958, subsequent to the meeting in Captain Moore’s office, a travel order was requested, and on the'same date, Travel Order T-569-58 [1] was authorized, signed by Captain Moore, and thereafter delivered to plaintiff on the Friday before his assignment to Reading was to commence. The order was a single-trip type order, i.e., a temporary duty travel order (see finding 16, m/m), which shows, among other things, the purpose of the travel to be “In connection with construction of new training center under Contract *238 NBy-11590”; that plaintiff was to travel on or about June 11, 1958, from Philadelphia, Pennsylvania to Reading, Pennsylvania, “& RETURN”, for an estimated 30 days duty, including travel time; that the travel was to be accomplished by July 20, 1958, that $12 per diem was authorized, the total cost of this item being estimated at $360; and that no allowance was made for transportation because plaintiff was to travel by Government vehicle.
6. Credible and acceptable testimony was presented to the effect that plaintiff could not have returned from Reading to Philadelphia on the 'travel order issued to him sooner than the 30 days authorized, without prior authorization from the District Public Works Office in Philadelphia; that he could not have used the order to return to Philadelphia subsequent to July 20, 1958, because the travel authorized thereby expired on that date; that although Reading was to become plaintiff’s permanent duty station upon his arrival there, he was sent to Reading on temporary, rather than permanent, travel orders for the purpose of assisting him financially by providing subsistence that would help defray transitional expenses incurred by reason of his transfer; that the District Public Works Office was aware of the fact that instructions issued by the District Officer required that plaintiff be advised by written notice that his assignment was being made permanent (see finding 14, infra); and that the District Office planned to send such written notice after the expiration of plaintiff’s travel orders but forgot to do so.
7. Plaintiff left Philadelphia on the afternoon of the same day he received his travel orders and on the following Monday morning, he reported for duty at Reading where he remained until sometime in September 1959. Plaintiff presented incredible testimony, bordering on the ridiculous, to the effect that prior to leaving Philadelphia, he not only did not know he was to be assigned to Reading for the duration of the training center construction project, but also that he did not know anything more about the training center project than indicated on his travel order; that he was not told why he was going to Reading; that he did not ask why he was being sent there; that he did not inquire as to who the resident inspector on the job would be; that he did not know or inquire as to who was going to be the resident in *239 spector on tbe center construction project; that be was given no instructions as to bis assignment or duties; and that upon arrival at Reading, be simply went out to tbe job site and apparently started working in tbe capacity of resident inspector without any authority, directions, or discussions with anyone in charge of construction operations.
8. On July 8, 1958, about 2 weeks prior to tbe expiration of plaintiff’s travel order on July 20,1958, a ground breaking ceremony was held at the new center in Reading, which was attended by Captain N. J. Drustrup, then District Public Works Officer at Philadelphia. While plaintiff denied that he was advised or knew that he would be kept on the job permanently, he admitted that he “suspected” this would be done and indicated an awareness of the possibility to Captain Drustrup during a short conversation they had following the dedication ceremony. Testimony presented by plaintiff that at this time he specifically asked Captain Drustrup whether he was to remain at Reading and that in response to this inquiry, Captain Drustrup simply said “You drop me a line,” is rejected as incredible. Plaintiff’s testimony, considered with other evidence, shows that he was clearly aware of the fact that he was going to remain at Reading; that he indicated to Captain Drustrup that the cost of living out of town was so much higher than when he was residing at hom.e that he felt entitled to an additional 30 days subsistence; that plaintiff simply requested that he be given an additional 30 days subsistence; and that Captain Drustrup’s suggestion that plaintiff write to him was directed to plaintiff’s request for more subsistence and did not relate to an asserted inquiry by plaintiff as to whether he was to be kept on the project at Reading. (See finding 10, infra.)
9. A daily log book maintained at the site of the training center project contains an entry made by plaintiff which reads as follows: “Informed Mr. Larrimer my thirty (30) days are up at Reading, Pa. — 7/16/58.” Plaintiff testified that he included in his weekly report, a handwritten letter addressed to Mr. Larrimer (mentioned in finding 2, supra), advising him as indicated in the above-mentioned log entry. While this may or may not be true, the Government denies any knowledge of such a communication and there is no documentary or other corroborating evidence in the record that *240 plaintiff sent the letter in question. In any event, said log entry and possible letter do not constitute proof that plaintiff then did not know that he was permanently assigned to Beading. Bather, such evidence simply shows that plaintiff felt he should alert his supervisor to the fact the 80 day temporary duty travel order issued to him had expired and that it was time for required personnel actions involving his reassignment to be taken.
10. On July 22, 1958, 2 days after the travel order issued to plaintiff expired, he wrote a letter to the District Public Works Officer, which letter was postmarked July 23, 1958, and reads as follows:
Pursuant to our conversation of July. 8th, 1958, at Beading, Penna., re my getting an additional 30 days’ subsistence, [sic]
As I explained to you, the cost of living out of town is so much higher than when you are living at home, I feel I am entitled to this 30 days’ additional subsistence.
I know from past experiences other branches of the United States Government service grants a man when he transferred from one point to another point the minimum of 60 (sixty) day [sic] subsistence. In lieu of this I feel I should have an additional 30 (thirty) days’ subsistence.
I shall welcome hearing from you in this connection.
11. (a) Plaintiff testified that he did not receive a reply to his letter of July 22, 1958. However, the evidence shows that the District Public Works Officer sent a reply letter to plaintiff at the Penn-Plaza Hotel, Beading, Pennsylvania, his last known address, under date of August 6,1958, which reads:
In regard to your letter of 22 July regarding the possibility of our granting an additional thirty (30) days’ subsistence, I have checked with our Administrative Division and also conversed with Mr. Larrimer, Mr. Downey, CDB. O’Donnell and OAPT. Moore.
The sum and substance of their information was that once it has been determined that an employee sent to a permanent assignment is going to remain there, the continuance of further subsistence cannot be justified. Your work has been completely satisfactory at Beading, and it is our present intention that you will remain there for the duration of the contract.
*241 Under these circumstances, it will not be possible to extend your subsistence for more than the initial thirty (30) day period. I sincerely regret any personal hardship this may cause you and while it is my policy to try to assign personnel with a minimum of dislocation this is not always possible under conditions of shifting workload especially when they coincide with a shrinking budget.
(b) While plaintiff’s testimony that he did not receive the above letter may be true, the evidence indicates that plaintiff had moved from the Penn-Plaza Hotel prior to the time the letter was sent. Although plaintiff testified that he went back to the hotel on one occasion some time after he had moved from there, inquired for mail, and found none for him, the foregoing suggests an explanation as to why plaintiff may not have received the letter in question.
12. (a) The letter of August 6', 1958 (quoted in finding 11, supra), was drafted for the signature of the District Public Works Officer by Mr. Paul E. O’Donnell, then the Assistant District Public Works Officer for Construction. Sometime in the summer of 1958, probably subsequent to plaintiff’s talk with Captain Drustrup on July 8,1958 (see finding 8, supra), and certainly prior to the time the above-mentioned letter was sent to plaintiff, O’Donnell visited the training center job site for the purpose of checking on the project. On this occasion, O’Donnell talked with plaintiff about his job and told him that he was going to remain at Eeading until the job there was finished.
(b) Plaintiff indicated that he was unhappy being on this particular assignment, appeared distressed because it was costing him so much more to live in Eeading than at Philadelphia, and expressed a desire to be paid expenses while assigned to the training center project. During their conversation, O’Donnell gained the impression that plaintiff had tried, through his immediate superior, without success, to obtain additional subsistence and that he was appealing the denial of his request to higher levels of authority. Mr. O’Donnell was unfamiliar with the situation and although he expressed the view to plaintiff that officials in the District Office had done the 'best they could, he stated that he would check on the matter upon his return to Philadelphia.
*242 (c) In connection with the foregoing, it should, be noted that although plaintiff admitted that at no time subsequent to July 1958, until the completion of the training center project in 1959, did he ever inquire of anyone as to how much longer he was going to remain at Reading, he never mentioned having a conversation with Mr. O’Donnell. Considering this fact and the credible testimony presented by Mr. O’Donnell, as well as other testimony and evidence in the record, plaintiff’s testimony that he never understood that he was permanently assigned to Reading, that he never asked anybody (besides Captain Drustrup) as to whether he was to be kept there until the completion of the job, and that he was not told by anyone that he was permanently assigned to Reading, also is rejected as incredible.
13. Upon Mr. O’Donnell’s return to the District Public Works Office headquarters, he talked with various officials, including plaintiff’s immediate supervisor, personnel in the Administrative Division, and the District Public Works Officer, concerning the reasons that had prompted the selection of plaintiff for this assignment, something about his experience, his request for an additional 30 days subsistence, and office policy with respect to payment of expenses in situations such as the one involved in this case, before drafting the letter of August 6, 1958 (quoted in finding 11, and mentioned in finding 12, supra). Considering all of the testimony presented by O’Donnell as a whole, it is clear one of the purposes of his visit to the training center construction project was to determine whether personnel, including plaintiff, were performing their duties in a satisfactory manner; that he concluded that plaintiff was doing a good job; that he did not check on plaintiff’s work for the purpose of determining whether he should be permanently assigned to the job; that he understood plaintiff was permanently assigned to the project for the duration thereof and was not there on a trial basis; that it was his general policy not to change a resident inspector once he was assigned to a particular job; that even though plaintiff had been sent to Reading on a permanent assignment, he could have been recalled, if he went “sour”; and that the statement in the letter of August 6, 1958, to the .effect that it was the “present intention” of the District Office to keep plaintiff on the job for the duration of *243 tbe contract, was included merely as a “hedge” in the event plaintiff “went sour and started to do a very poor job of inspection”, in which case plaintiff would have been relieved and replaced.
14. It is undisputed that on June 4,1959, plaintiff received a telephone call at Reading from his immediate superior, Mr. Larrimer, who asked him if he had ever received a letter transferring him to Reading, to which inquiry plaintiff replied in the negative; that plaintiff was relieved of his assignment at Reading about the middle of September 195i9, by oral instructions given to him by a representative of the District Public Works Office who came to Reading and told plaintiff to return to the Philadelphia Navy Yard; and that plaintiff did not receive a written notification that his assignment at Reading was completed. Defendant admits that plaintiff was never advised in writing that his assignment to Reading was made permanent; that plaintiff’s personnel jacket contains no record of any such written notification or any other written notice of a permanent change in duty status to Reading; and that through inadvertence, the District Public Works Office failed to send plaintiff a written memorandum form notice of permanent reassignment to Reading after the expiration of the travel order issued to him; however, defendant contends that the foregoing facts are irrelevant or immaterial because there is no requirement in law that a change in permanent assignment must be in writing and in support of this argument, cites a decision of the Comptroller General, dated August 30, 1950, 30 Comp. Gen. 94, 95 (B-96669), which reads in part:
An employee performing official duties at a temporary station is entitled to per diem in lieu of subsistence at such place up to the date an official notice that the temporary station is to become his permanent station is communicated to him by proper authority, and such notice is not required to be a formal or written notice but should be definite as to the action being taken to change the employee’s duty station from temporary to permanent [Head note.]
Comptroller General Warren to the Administrator, Housing 'and Home Finance Agency, August 30, 1950:
Reference is made to your letter of July 3, 1950, requesting a decision as to the effective date of the change of an employee’s duty station from temporary to per *244 manent for purposes of discontinuance of per diem in lieu of subsistence under circumstances as hereinafter related.
$ ‡ $ *
Your letter indicates that you are aware of the rule expressed in decisions of this Office to the effect that an employee may not be allowed per diem in lieu of subsistence at a place where he is on temporary duty after he receives notice that such place is to become his permanent duty station, but that you are in doubt as to how formal the notice must be to the employee. In that connection, you are advised that the above rule has never been confined to the date of the employee’s receipt of a formal or written notice of the change of his official station, it being sufficient that the employee actually knew officially that his temporary place of duty was to become his permanent duty station. However, the notice to the employee not only must be communicated to him by proper authority but should be definite as to the action being taken so as to leave no doubt in the employee’s mind with respect thereto.
# * * * *
15. (a) District Public Works Office Instruction 12340.2, entitled “Reassignment of Construction and Inspection Personnel”, and issued by the District Public Works Officer, Fourth Naval District, U.S. Naval Base, Philadelphia, Pennsylvania, to “Distribution List”, under date of April 26,1956, reads in pertinent part:
3. Policy. All Construction and Inspection personnel in the ratings of * * * or Inspector are employed subject to assignment to any construction site within the Fourth Naval District where their services may be required. The Manager, Construction and Inspection Branch, is delegated the authority to assign individual employees to the various construction sites as he deems necessary * * *. In assigning an employee to a construction site outside the commuting area in which his current duty station and residence are located, the following shall apply:
a. For assignments of short duration (usually two months or less), temporary additional duty travel orders will be issued and the employee shall be reimbursed for transportation and per diem subsistence.
b. For assignment of extended duration (usually two months or longer), the employee will be officially reas *245 signed to the new duty station. * * * Further allowance for travel or per diem expense incidental to the change in duty station shall not be permitted after the date of official reassignment.
4. Action;
a. The Manager, Construction and Inspection Branch, is authorized to and will issue a letter to each employee reassigned, as far in advance as practicable. This letter will set forth the effective date of assignment and will repeat the conditions regarding transportation, etc., which were discussed with the employee previously. One copy of such letter will be forwarded to the Personnel Branch for incorporation in employee’s personnel jacket.
b. Personnel action forms to effect official reassignment will be prepared by the Personnel Branch.
(b) In failing to send plaintiff a notice of permanent assignment to Beading, Pennsylvania, the District Public Works Office did not comply with paragraph 4a. of District Public Works Office Instruction 12340.2, supra.
(c) The testimony shows that the reason a written notice of permanent reassignment to Beading, Pennsylvania, was not given to plaintiff prior to his departure for that place, pursuant to paragraph 4a. of D.P.W.O. Instruction 12340.2, supra, was because officials of the District Public Works Office were aware of the Comptroller General’s Decision of August 30, 1950 (partially quoted in finding 14, supra), as well as the provision in paragraph 3b. of said Instruction which reads in pertinent part “. . . allowance for . . . per diem expense incidental to . . . change of duty status shall not be permitted after the date of official reassignment”; that in view thereof, they concluded no per diem could be paid to plaintiff subsequent to the issuance of a reassignment notice; and that, therefore, it was decided to send plaintiff to Beading on temporary duty travel orders for an orientation period of 30 days and to issue a notice of permanent reassignment upon the expiration of this period. In other words, notice of permanent reassignment was not issued to plaintiff because this would have precluded him from receiving the per diem which he actually realized by reason of the travel order issued.
16. Pertinent sections of a document entitled Navy Civilian Personnel Instructions (N.C.P.I.) 240, relating to the sub *246 ject of travel by sucb personnel, are quoted in relevant part below:[2]
240.1-3. DEFINITIONS.
‡ ‡
o. Reassignment, change m duty post. — For purposes of this Instruction the term means a movement of an employee within the Navy without a break in service of one or more work days from one activity to another for permanent duty. The employee remains under the releasing activity for purposes of general supervision, pay and the maintenance of personnel records. The new duty station becomes the employee’s factual headquarters because his principal duties are performed there. The movement must be in the interest of the Navy.
p. Single-trip travel order. — A temporary duty travel order under which an employee is authorized to travel from his permanent duty post to one or more points and to return to the permanent post of duty.
q. General tra/oel order. — A travel order under which an employee is authorized to travel on official business as the duties of his position require. It is distinguished from the single-trip travel order in that as many trips can be made as the employee’s duties require. In issuing a general travel order on NAYEXOS-4184, the authorizing official is required to state the dates between which the order is valid.
* * * %
240.8-2. GENERAL PROVISIONS.
a. Basic Policy. — It is the policy of the Navy that travel by civilian employees shall be directed only for those purposes and by those means as are clearly in the best interests of the Government. Rates of reimbursement for official travel should be so fixed as to approximate necessary authorized expenses incident to official travel so that employees are neither financially rewarded nor penalized by reason of travel status. This policy is predicated upon the following basic principles:
sf: *f»
(4) Travel which is performed from a number of geographic points or from a number of bureaus or activities to one central geographic point should be reimbursed uniformly. An example of this is travel directed by a departmental headquarters or by an activity for a num *247 ber of individuals located at different points to a conference, scheduled meeting, or other temporary duty assignment at one central point. Officials responsible for arrangements of the meeting or temporary duty should determine the appropriate per diem rate for such travel and advise all activities concerned before the issuance of travel orders. Whenever practicable, the same principle should be observed in fixing the appropriate per diem rate when temporary duty is performed aboard a naval vessel by employees from different activities located in the same or different geographic areas. In the latter case, the “lead” activity should determine the rate.
‡ ‡ *
h. Restrictions on per diem allowances.—
(1) Per diem will not be allowed an employee either at his permanent duty station or at his place of abode from which he commutes daily to his official station. * * *
«Je *í» H* *f* íf»
240.8-3. CRITERIA TO BE OBSERVED IN AUTHORIZING OR APPROVING PER DIEM ALLOWANCES.
a. In the continental United States. — Except under the circumstances of travel in d, below, a per diem allowance not in excess of $12.00 may be authorized or approved. Since a $12.00 per diem allowance is the maximum, and not the minimum, which may be authorized, only such per diem allowances shall be authorized as are justified by the circumstances affecting the travel, including prolonged periods of temporary duty at one place.
$ ‡ $ $ *
g. Prolonged temporary duty. — When the length of temporary duty at one place will exceed two months, consideration shall be given to a change in official station, unless there is a basis for expecting the employee to return to his permanent duty station within a reasonable time after the expiration of the two-month period. The per diem authorized should be reexamined at the end of each month of temporary duty to determine whether continuance of the per diem allowance prescribed is justified, or whether a different per diem allowance should be prescribed. See NCPI 240.10-Encl. 1, Sec. 6.2d and Sec. 6.9b.
* H* * * $
240.10-Encl. 1
*248 Section 6. subsistence expenses
6.2 Bates of per diem. — * * *
‡ ‡ #
d. In any case where the employee’s tour of travel requires more than two months’ stay at a temporary duty station, consideration should be given to either change in official station or a reduction m the per diem allowance.
17. After plaintiff arrived at Leading, he remained there on the job for a period totaling 460 days. He received per diem in lieu of subsistence for 30 of these days at the rate of $12 per day, totaling $360. Subsequent to plaintiff’s return to Philadelphia from his assignment at Leading in 1959, he filed a supplemental claim for 400 days per diem at the rate of $12 per day, totaling $4,800, in lieu of subsistence expense, for the time he was at Leading, which claim was denied by the Office of Industrial Lelations, Department of the Navy. Thereafter, on September 19,1963, plaintiff filed his petition herein.
Conclusión of Law
Upon the foregoing findings of fact and opinion, which are adopted by this court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

 Plaintiff denies that he attended the meeting and argues that certain facts hereinafter set forth show that the testimony presented by Government witnesses upon which the foregoing facts are based is not worthy of belief. As indicated in finding 4, infra, plaintiff’s testimony with respect to this meeting is rejected as incredible and his argument is completely unpersuasive.

 See Plaintiff’s Exhibit No. 1.

 See Plaintiff’s Exhibits Nos. 6, 7, 8(a) and 8(b).