Robert Thomas QUICK

v.

The **UNITED STATES.**

No. 314–67.

United States Court of Claims.

July 15, 1970.

Thomas M. Gittings, Jr., Washington, D. C., attorney of record for plaintiff.

LeRoy Southmayd, Jr., Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON DEFENDANT'S MOTION AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This case is before us on cross motions for summary judgment. Plaintiff, a veteran preference eligible, is suing to recover compensation denied him by defendant's alleged failure to respect established salary preservation rights of involuntary demotees. The Civil Service Commission's Board of Appeals and Review (BAR) found the demotion to be a voluntary one and accordingly rejected plaintiff's claim. We affirm their decision.

Except for an interruption for military duty, the plaintiff, Mr. Quick, has been in continuous Government service, in various capacities, since 1933. In November 1961, he was employed by the Army Corps of Engineers (Army) as a Supervisory Construction Management Engineer for the United States Army Engineer District in Jacksonville, Florida (hereinafter Jacksonville District). In March 1963, plaintiff was notified by the Army that his services would be required at the newly established Canaveral District on Merrit Island, Florida. (We notice judicially that Merrit Island is about 150 miles southeast of Jacksonville). Given the choice between transfer—which included a promotion to GS-14 and an annual salary increase of almost $800—and immediate separation, plaintiff elected the transfer even though he recognized it would require commuting between Merrit Island and Jacksonville—plaintiff's residence—on weekends.

While employed at Canaveral, plaintiff had occasion to visit the Jacksonville District on business. There he was informed by his former supervisor, Chief of Construction Division, F. O. Biehn, of an expected GS-13 vacancy soon to arise in the Jacksonville District. Because of plaintiff's proven qualifications, Chief Biehn urged him to apply for the position when it became open.

Almost one year after plaintiff's discussion with Mr. Biehn, Vacancy Announcement #64–40 was issued advertising a Supervisory Construction Management Engineer GS-13 position at the Jacksonville District. In addition to listing the duties and desired qualifications for the position, the announcement noted that "Applications will be accepted from individuals having Career-Conditional or Career status." Plaintiff's declared understanding of this language was that it "solicited all interested and qualified persons possessing the stated special skills to apply for the vacancy." Aside from the general GS-13 rating, the announcement failed to mention exact salary.

Plaintiff alleges in his petition and in his brief that he received a copy of Vacancy Announcement #64–40 by mail from the Jacksonville District. He did not identify the sender, however, nor did he explain the circumstances which caused the announcement to be sent. In the argument portion of his brief, plaintiff merely said that "*officials* of the Jacksonville District Office" sent it. (Emphasis supplied.) The relevance of this factual deficiency will become evident in the analytical part of our opinion.

Admittedly desiring reassignment to Jacksonville for reasons of personal convenience, plaintiff, in writing, requested consideration for the position. He attached to this request a detailed Standard Form (SF) 57 in which he indicated that the lowest pay and grade he would accept was $14,000 per year and GS-13. (This information was somewhat gratuitous since the vacancy announcement made the enclosure of an SF-57 optional.) In oral argument plaintiff's counsel described this minimum pay statement as just an "opening offer" not to be judged inconsistent with Mr. Quick's allegedly reasonable expectation that if selected he would receive a salary slightly

above or below his last earned rate at Canaveral.

In January 1965, plaintiff was notified of his selection; precise rank and salary, however, were not disclosed. Plaintiff nevertheless accepted the position without this information. Upon reporting for duty at Jacksonville, Mr. Quick was given an SF–50, Notice of Personnel Action, advising that his appointment to fill the vacancy was being effected at GS–13, Step 7. In monetary terms this meant an entrance salary of $14,595 per year. Since plaintiff had been earning $15,640 at Canaveral, this new rating constituted a decrease in gross annual pay of $1,045.

The record reveals that plaintiff's salary was set by Mr. Biehn who believed that for purposes of maintaining good personnel relations among his staff, plaintiff, as a new Branch Chief, should not be rated higher and paid more than the Assistant Chief of the Construction Division. Mr. Biehn did, however, fix plaintiff's salary and rank *equal* to that of the Assistant Chief's and in so doing offered Mr. Quick $1,200 more per year than that paid to his immediate predecessor. Upon receiving the SF–50, plaintiff was troubled by the pay reduction, and orally he asked Louise Brown, the Personnel Staffing Specialist, for an explanation. Mrs. Brown says that she responded with an essential restatement of Mr. Biehn's position and that plaintiff replied, after further elaboration, that he "expected the explanation". She also observed that plaintiff seemed "satisfied with it [the explanation]". Plaintiff, on the other hand, recalls that Mrs. Brown simply told him that "by regulation, his salary could not exceed that of his * * * supervisor, the Assistant Chief." Although plaintiff later criticized this explanation as erroneous since the Assistant Chief was not his supervisor, Mr. Biehn, in a clarification to the District Engineer responded as follows: "While it is true that the Chief of S & I Branch [plaintiff] reports directly to the Division Chief, the Assistant Chief is *responsible* during absences of the Chief * * *." (Emphasis supplied.) Hence, the inference is that occasionally, at least, plaintiff would have found himself subordinate to and under the supervision of the Assistant Chief.

After an unsuccessful protest to the Jacksonville District Engineer, plaintiff, with senatorial assistance, appealed his pay reduction to the Civil Service Commission. Although the Regional Office in Atlanta, Georgia, dismissed his petition as untimely, the BAR chose to reach the merits irrespective of the timeliness issue. Satisfied that plaintiff's demotion was a voluntary one, the BAR concluded "that the change in pay which accompanied [it] * * * was not an action requiring the application of the provisions of Part 752 of the Civil Service Regulations * * * [and hence plaintiff's appeal was not reviewable] within the purview of Part 772 of the Commission's Regulations."

Plaintiff next sought review of the District Engineer's decision from the Army's Office of Civilian Personnel (OCP). Director of the OCP, C. F. Mullaly, however, sustained the decision below.

Alleging that his entrance salary was determined contrary to Civil Service Commission and Army civilian personnel regulations, plaintiff now petitions this court to award him the difference between the compensation of GS–13, Step 10—the rate he says he should have received—and GS–13, Step 7—the rate he actually did receive upon transfer to the Jacksonville District. He further asks that we compute his award from January 17, 1965, his starting date, to the date of judgment, and that we enhance it with "any * * * statutory increases and/or step increases" to which he may be entitled by law.

I.

The first issue controverted by the parties is whether plaintiff timely invoked his administrative remedies. In taking the negative side here the Government assumes *arguendo* that plaintiff's

salary reduction sprang from an involuntary demotion and hence was an appealable adverse action. The facts are undisputed: Plaintiff waited eight months before filing a written protest with the Jacksonville District Engineer; he delayed four additional months before appealing the District's decision to the Civil Service Commission. Various excuses were presented to the Commission to explain plaintiff's tardiness, but the Regional Office rejected them as insufficient. Had the BAR, in denying plaintiff's appeal, reacted similarly, the timeliness issue would still remain in the case for our consideration. The BAR, however, unfavorably ruled on Quick's appeal "irrespective of the time element", thereby effectively removing this issue from our present scope of review.

## II.

Turning to the merits, we find plaintiff's most salient argument to be that his so-called demotion was involuntary and that the Army, in fixing his entrance salary, arbitrarily ignored its own regulations governing such cases. To determine voluntariness we are urged by plaintiff to apply the relevant standards prescribed in the Army Civilian Personnel Regulations (CPR). These standards are reserved for "salary retention eligibles", (5 U.S.C. § 1107 (1964)), a statutory group for which Mr. Quick does not claim to qualify regardless of the characterization of his demotion. Plaintiff nevertheless argues that because Army and Civil Service regulations are otherwise silent, these standards should be given general applicability. Army CPR P3 § 2–7 in pertinent part reads as follows:

\* \* \* \* \* \*

*Demotion or Reassignment at Employee's Request*

b. (1) Denial of salary retention on the grounds that an employee's demotion or reassignment is at his own request must be based on a determination that the employee's request is the *direct cause* for removing him

from his current assignment. In making such determination the following principles should be applied:

(a) When the action which results in demotion or reassignment is initiated by the *employee* for his personal advantage or desires, and the appointing officer's action is responsive thereto, salary retention, benefits do not apply. The most common example of an employee-initiated action is when an employee requests to be moved to another position even though a possible loss of pay may be involved. (Emphasis above in original.)

(b) When the action which results in demotion or reassignment is initiated by the Department of the Army, it is not taken at the employee's request, even though he may have asked the Department to consider his personal situation (which may require his acceptance of a lower grade) before final action is consummated. *Some examples of the kinds of actions which are not considered to be initiated by the employee even though he may have submitted a written request are as follows:* (Emphasis supplied.)

\* \* \* \* \* \*

2. A demotion or reassignment as a result of *solicitation by the Department to fill a position requiring special skills,* or to otherwise further a placement program. (Emphasis supplied.)

\* \* \* \* \* \*

Federal Personnel Manual Supp. 990–2, Book 531, subchapter S5, § 5d2(b) (1965), contains provisions almost identical to the above-quoted Army regulations.

Plaintiff's major premise is that the "direct cause" of his demotion was a

"solicitation by the Department to fill a position requiring special skills". If this were true then according to the regulations it would follow that the demotion was not at plaintiff's request and therefore involuntary. Moving from this premise as if it were established, plaintiff argues that the Army arbitrarily ignored its own regulations preserving salary rights of involuntary demotees. Army CPR P3 § 2–6 reads as follows:

## CHANGE TO LOWER GRADE OF EMPLOYEES INELIGIBLE FOR SALARY RETENTION BENEFITS

2–6. Except as provided below, when an employee who is ineligible for salary retention benefits as provided in paragraph 2–7 is changed to a lower Classification Act grade his pay *will be fixed in the new grade at a step rate which preserves to him, so far as possible, his last earned rate.* * * (Emphasis supplied.)

\* \* \* \* \* \*

Affirming this policy with similar exceptions to be discussed later is Army CPR P3 § 1–2(a).

We do not accept the major premise of plaintiff's syllogism. The burden of plaintiff's argument balances on his interpretation of "solicitation by the Department to fill a position requiring special skills." Plaintiff would have us believe that the friendly urging of Mr. Biehn, his former supervisor, to apply for the position and the mailing by nameless Jacksonville District "officials" of the vacancy announcement to him combined to constitute a "solicitation by the Department" within the contemplation of the regulation. To ascribe validity to such an interpretation would be to condone wrenching the regulation to the breaking point. We accept that plaintiff was "solicited", but we do not accept that he was solicited "by the Department"—a phrase connoting the explicit formality of an official personnel action. Moreover, we do not believe that plaintiff was solicited "to *fill* a position

requiring special skills." (Emphasis supplied.) Mr. Quick was merely advised by Mr. Biehn and the announcement of the opportunity to *apply* for the position. In plaintiff's own words, the vacancy announcement "solicited *all* interested and qualified persons possessing the stated special skills to *apply* for the vacancy." (Emphasis supplied.) It is our belief that the procedure of soliciting someone to *fill* a position at minimum requires singling out the employee and tendering him the opportunity of *accepting* a particular slot. Merely extending him opportunity to compete for it obviously falls short of this criterion. Plaintiff could have ignored the announcement and kept his GS–14 position at Merrit Island without even hurting anyone's feelings, so far as the record shows.

 Hence we find that plaintiff's demotion was not consequent to a "solicitation" as qualified by the regulation, and we now must discern the actual "direct cause" for it. The answer, we believe, is clear: the so-called demotion was sought voluntarily by Mr. Quick. Continuing to maintain his Jacksonville residence while working at Canaveral, plaintiff found it necessary to commute between these two places on weekends— a round trip of almost 300 miles. And, although it was not mentioned in his brief, it is nevertheless reasonable to assume that he experienced all those other minor but still annoying inconveniences which attend away-from-home living. A transfer back to Jacksonville would have removed these complexities. Undoubtedly, Mr. Quick considered these advantages before applying, and thought them important enough to offset a cut in pay. His conduct throughout supports these inferences. For example, to compete better with other applicants, apparently, plaintiff indicated on his SF–57 that he would accept a minimum annual salary of $14,000—$1,640 less than his then present Canaveral salary. Moreover, in a protest to the District Engineer, filed some nine months after his application, plaintiff described his mood

thusly: "In January 1965, [actually it was December 1964], I *voluntarily* applied for the position of Chief, S & I Branch, Construction Division, and *accepted* a demotion to return here [Jacksonville] from the Canaveral District, where I had been Assistant Chief, Construction Division, GS–14." (Emphasis supplied.) Plaintiff also revealed in this protest not only his dissatisfaction with Army salary fixing methods, but more important, his retirement anticipation which lurks as the primary motivation for this law suit. The following paragraph from the protest is enlightening:

4. It was not necessary by regulation to make the salary reduction *although the District has the authority to establish the salary under such a transfer and demotion, at any step it elects.* In my opinion, such reduction should be made known at the time the offer is made for transfer. *I had anticipated that I may have had to accept some reduction in salary, to obtain consideration,* however, I would have appreciated the opportunity to discuss the matter prior to having the action taken. *The salary is of more than usual importance to me as I am probably on my last five years of Government service and a $1,000 salary reduction means over a $600 per annum reduction in retirement pay.* (Emphasis supplied.)

It is reasonably inferable from the above quotation that plaintiff, when he applied for and accepted the position, was unaware of the consequences a pay reduction would have on his retirement income. Had he known, he would possibly not have jeopardized his retirement status without first requesting advice as to the exact salary involved.

On the facts therefore we find plaintiff's action to have been voluntary. Our next task is to determine whether the Army complied with its civilian personnel regulations in fixing Mr. Quick's salary. Pertinent to this inquiry is Army CPR P3 § 2–6b:

*Actions Initiated by Employees*

b. When the change to lower grade is the result of an employee's application or request * * *, his pay *may be* fixed at any step rate of the new grade which is not in excess of his last earned rate. * * * (Emphasis supplied.)

Hence, in contrast to involuntary demotion cases, the Army is accorded discretion in fixing a voluntary demotee's salary anywhere below a specific ceiling—the last earned rate. Their discretion, however, is not unfettered. Army CPR P3 § 1–2 reads as follows:

\* \* \* \* \* \*

Optional Fixing of Pay Not To Exceed Last Earned Rate

b. In the cases covered below [paragraph (2) of which deals with employment changes at employee's request] the proposed rate must be *appropriate* for the employee's known or presumed productive ability and *equitable in terms of his experience as compared with that of other employees currently serving in similar positions.* (Emphasis supplied.)

\* \* \* \* \* \*

All the evidence indicates that Mr. Biehn, in fixing plaintiff's salary, acted in good faith in harmony with this qualification. Plaintiff not only received almost $600 more than he initially said he would accept, but also $1,200 more than his immediate predecessor. The record further discloses that of the four Branch Chiefs in the Jacksonville District, plaintiff was graded highest. More importantly, assuming that plaintiff could be considered—in the sense of the above regulation—as serving in a position "similar" to that of the Assistant Chief, nothing was offered by him to establish that he possessed experience so superior as to merit a higher rank. Under such circumstances it could have been thought "equitable" for plaintiff to receive pay equal to but not more than the Assistant Chief, especially where the latter rose above their assumed parallel status by occasionally substituting for

the Chief of the entire Construction Division. We hold therefore that plaintiff's new salary could have been deemed fair, in compliance with regulation CPR P3 § 1–2b., *supra*.

██ Plaintiff's alternative argument is that the demotion was involuntary because it was accomplished through Government deception. He reasons that "to withhold all knowledge of a major reduction in compensation of $1,645 per annum until [he] had been officially transferred to the new position, and had reported for duty, clearly constituted deception * * * which served to deprive [him] of his freedom of choice in determining whether he wanted to accept the tendered position."

This naked allegation is insufficient. Since plaintiff produced no evidence to indicate that the salary reduction information was *intentionally* withheld by the Army under the conditions alleged, we cannot find that its conduct was deceptive. At worst it was insensitive and impersonal. Colonel R. P. Tabb, the Jacksonville District Engineer, and Army OCP Director C. F. Mullaly both admitted that it would have been better if the Army had achieved with plaintiff a "clear understanding" as to salary before the transfer. No doubt perfection in personnel administration would have called for this, but plaintiff as a Federal employee since 1933 should have been well aware of his employer's weaknesses in that area. Multi-divisional bureaucracies like the United States Army frequently act with less than desirable clarity. Where a plaintiff asserts an unclear action was purposefully motivated to deceive, it is not unreasonable for us to inquire why plaintiff himself took no positive efforts to clarify matters. Indirectly explaining his failing, plaintiff tells us that because he "was not informed at this time [notice of selection] that there would be any reduction in his present compensation * * *, he concluded that there would be little or no reduction in compensation attached to the reduction in rank, and accordingly,

[he] accepted the offer of the vacancy." Since, however, no tangible Government guile is cited by plaintiff as leading him to this belief, we conclude that his erroneous assumption was the result of self-deception only.

██ Plaintiff also raises two other procedural deficiencies allegedly affecting his demotion: the Army's failure to obtain his written consent to a voluntary demotion, and its failure to inform him of his eligibility for salary retention benefits. Both procedures, he argues, were directed by the regulations. Specifically, plaintiff proposes that assuming he was found to have voluntarily consented to his demotion, his consent would be ineffective "because of the failure of the Jacksonville District office to reduce the consent to writing." Thus he maintains that defendant is estopped from "relying upon his alleged consent to deprive [him] * * * of the additional salary claimed."

Civil Service Regulation 5 C.F.R. § 531.507, as of 1965, and Army CPR P3 § 2–7b(2), both provide that an employee should be made to execute a written consent document affirming the voluntariness of his decision to accept demotion. Defendant contends that plaintiff's execution of the SF–57 wherein he indicated that he would accept, at minimum, a GS–13 and $14,000 per year, satisfied these regulations. Plaintiff insists that it did not and additionally cites a section of the Federal Personnel Manual Supp. 296–31, Book II, Subchap. S2, § S2–11 (1965), which further requires that:

> When a demotion is effected at the employee's request, the notation "Action effected at the employee's request," is entered under "Remarks" on Standard Form 50. * * *

Such a statement, plaintiff correctly points out, was not recorded on his SF–50.

Assuming that plaintiff's SF–57 falls short of the type of written consent document envisioned by the regulations, we nevertheless do not agree with plaintiff that his consent was "ineffective"

and that therefore defendant is estopped from urging it. The primary thrust of these regulations is to protect the agencies from future attack. Federal Personnel Manual § S2–11, *supra,* supports our position:

> * * *. As a matter of precaution all the facts and circumstances of the voluntary request for reduction should be documented so that they will be available if the employee later appeals and contends that he was coerced, or did not understand the transaction, or did not initiate the action * * *

Thus the requirement is prescribed for the Government's benefit, not the employee's, and therefore a failure in literal compliance does not infect the legality of the personnel action itself, if substantial compliance is had. Since we have found other written evidence, the SF–57, that plaintiff *did* voluntarily consent to his so-called demotion, we hold the Army's failure to reduce his consent to writing and additionally note it on its SF–50 to be irrelevant.

▮ Regarding the Army's failure to advise plaintiff of his eligibility for salary retention benefits as required by § S2–9 of Subchapter S2 of Book II of the Federal Personnel Manual Supplement 296–31 and § 2–7n of Army CPR P3, we hold such a procedural defect to be nominal and non-prejudicial where plaintiff indicated an acknowledgment of his ineligibility prior to his demotion. Plaintiff indicated on his SF–57 that he would accept a minimum salary of $14,-000 per year. Had he then considered himself eligible for salary retention benefits under 5 U.S.C. § 1107 (1964) he certainly would have realized the inaccuracy of this statement. In his protest to the Army OCP, plaintiff did allege that this statement was made "through inadvertence", but since, in oral argument, his counsel described it as an intended opening offer, we infer that plaintiff does not press his inadvertence allegation and chooses to stand on the assertion that the statement was made with an intended purpose. Hence we conclude that even

if the Army had advised him of his ineligibility for salary retention benefits, either because of his failure to remain in the GS–14 grade at Canaveral for the minimum 2 year period (5 U.S.C. § 1107 (a) (4)) or because of the voluntariness of his demotion (5 U.S.C. § 1107(a) (3)), plaintiff still would have pursued the Jacksonville offer without changing the conditions of his application.

Plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is allowed, and therefore the petition is dismissed.

COLLINS, Judge, dissenting:

The key issue in this case is whether plaintiff's demotion was voluntary or involuntary, and it is mainly on this particular point that I cannot agree with the majority opinion. The regulation governing this question is Army CPR P3, § 2–7b(1) (1963), which reads as follows:

> *(a) When the action* which results in demotion or reassignment *is initiated by the employee* for his personal advantage or desires, and the appointing officer's action is responsive thereto, salary retention benefits do not apply. The most common example of an employee-initiated action is when an employee requests to be moved to another position even though a possible loss of pay may be involved.

> *(b) When the action* which results in demotion or reassignment *is initiated by the Department of the Army,* it is not taken at the employee's request, even though he may have asked the Department to consider his personal situation (which may require his acceptance of a lower grade) before final action is consummated. Some examples of the kinds of actions which are not considered to be initiated by the employee even

though he may have submitted a written request are as follows:

\* \* \* \* \* \*

2. A demotion or reassignment *as a result of solicitation* by the Department to fill a position requiring special skills, or to otherwise further a placement program. [Emphasis added.]

The key phrase in the above provision is "When the action \* \* \* is initiated \* \* \*." Thus, the question of whether a demotion is voluntary or involuntary should depend upon who iniates the action leading to the demotion. There is no doubt in my mind but that defendant initiated the action leading to the demotion in this case by soliciting plaintiff personally to apply for the position in Jacksonville. The fact that plaintiff was sent a copy of the vacancy announcement, in itself, amounts to a "solicitation by the Department to fill a position requiring special skills." But it should not be overlooked that plaintiff also was requested in person by Mr. F. O. Biehn, Chief of the Construction Division in Jacksonville, to apply for the job. This coupled with the sending of the vacancy announcement definitely shows that the Department solicited plaintiff for the position. I do not understand how this fact can be questioned.

Even the court conceded that plaintiff was "solicited," but it did not believe that he was solicited "by the Department." I assume that this is because there was no indication of which agency official actually sent plaintiff the vacancy notice. The court's reasoning on this point is very hard to follow since it would appear safe to assume, especially considering Mr. Biehn's oral solicitation, that the vacancy notice was sent by a Department official authorized to do so and not by some desk clerk acting ultra vires. The fact that the notice was authorized should, thus, amount to a solicitation "by the Department."

The court's reliance on the word "fill" in the regulation set forth above certainly seems unwarranted when one considers that the action was "initiated by the Department" and that plaintiff was personally "solicited" for the job. As the majority so succinctly stated: "To ascribe validity to such an interpretation would be to condone wrenching the regulation to the breaking point."[1] The court obviously would interpret the provision in question to mean that if the Department had either of two persons in mind to fill a job, in order for there to be a solicitation, it would have to choose one and ask him to take the position. If he refused, then it could ask the other, and this would also be a solicitation. However, if the Department asked both persons to apply for the job at the same time, this would not be a solicitation. The distinction exemplified by the above example is one for which I can find no valid basis, and I simply cannot agree that the word "solicitation" was meant to be limited to such a narrow situation. Where an individual is *personally* requested (in this case both orally and in writing) by a Department to apply for a job, this should amount to a "solicitation by the Department to fill a position." Consequently, I feel that plaintiff was solicited within the meaning of Army CPR P3, § 2–7b(1) (b) (2) (1963), and that this solicitation was the initial step leading to plaintiff's demotion. Thus, plaintiff's demotion was not voluntary.

Since plaintiff's demotion was involuntary, defendant was obliged to follow the mandate of Army CPR P3, § 1–2a (1963), which reads as follows:

The policy is to preserve, to the maximum extent possible, an employee's last earned rate of pay in the situations listed below.

(1) When a current employee of the Department of the Army is changed to another position without advancement in grade *and the action is not the result of his request* \* \* \*. [Emphasis added.]

---

1. The court's opinion at p. 1299.

Army CPR P3, § 2–6 (1963), also provides:

> Except as provided below, when an employee who is ineligible for salary retention benefits as provided in paragraph 2–7 is changed to a lower Classification Act grade his pay will be fixed in the new grade at a step rate which preserves to him, so far as possible, his last earned rate. * * *

In this case plaintiff's last earned rate of pay was GS–14, step 4, $15,640. This meant that when he was reduced to a GS–13, he should have been placed in either step 9 ($15,435) or step 10 ($15,-855), since the appointing officer has the discretion to choose either the higher or the lower as the last earned rate.[2] It should be noted that there was nothing which would have prevented plaintiff from receiving either of the above-mentioned salaries.[3]

There are several other points relied upon by the majority to support its finding of voluntariness which ought to be mentioned. The fact that plaintiff had a personal desire to get back to Jacksonville should not have any bearing on the voluntariness issue. Plaintiff's motive in applying for the job should be irrelevant; what is important is whether the action was initiated by plaintiff or the Department of the Army and whether plaintiff was solicited by the Department. Also the fact that plaintiff admitted voluntarily applying for the position should have little bearing since he was not aware of the technical difference between voluntary and involuntary as spelled out by the regulations. In addition, plaintiff's statement that he might have to accept a reduction in salary can easily be interpreted to mean that he anticipated a salary at GS–13, step 9, rather than GS–13, step 10.

Assuming for the moment that plaintiff's demotion was voluntary, I cannot agree with the court's treatment of the regulation requiring the Army to obtain plaintiff's written consent. Army CPR P3, § 2–7b(2) (1963), states:

> In advance of a demotion or reassignment to be made at an employee's request, there shall be secured from him a *signed acknowledgement that the demotion or reassignment is for his benefit or convenience* and that he is aware that salary retention will not apply if the action is taken. * * * [Emphasis added.]

The court tries to get around this provision by finding that it was enacted for the benefit of the Government to protect it from later allegations of coercion by the employee. While this may be true, this does not necessarily preclude the regulation from also being for the benefit of the employee to protect him from a demotion to which he never actually consented or even requested. Thus, it seems very logical to conclude that the provision could just as easily be for the benefit of plaintiff as for the Government.

The majority also relies somewhat on plaintiff's statement in the SF–57 form that he would accept a minimum grade of GS–13 and $14,000 in salary. I certainly do not agree that this inadvertent statement can be substituted for the requirement of written consent, nor do I feel that it should be allowed to overcome the regulation requiring defendant to advise plaintiff of his eligibility for salary retention benefits.[4] This type of statement in a job application form is

---

2. Army CPR P3, § 1–4c(2) (1963).

3. In a letter from R. P. Tabb, Colonel, Corps of Engineers, to plaintiff dated October 27, 1965, it was stated: "In reviewing your request I find that your salary could have been established at the level you requested. * * * On the other hand I also feel that your salary level should have been discussed at the time of job offer and not treated separate and apart from all consideration involved in your determination of acceptance."

4. Army CPR P3, § 2–7n (1963).

**1304**

not the type of statement which should be legally binding on the maker. It is designed primarily for informational purposes and should not have the same effect as a sworn statement. It certainly should not be allowed to overcome defendant's obligation to plaintiff under the pertinent regulations, which is exactly what the court is allowing in this case.

In conclusion, I cannot help but feel that the majority have allowed themselves to be influenced too greatly by certain factors in this case, such as the fact that plaintiff wanted to return to Jacksonville, and his statement that he would accept a minimum of GS–13 and $14,000. These are points which should be considered along with such other factors as plaintiff's continuous Government service since 1933 and his loss of $600 per year in retirement pay, should defendant prevail in this case, *only after* it has been determined that the Government has abided by its own regulations.

This court has consistently held in numerous cases that, in personnel matters, *Government agencies are bound strictly by their own regulations.* Fletcher v. United States, 392 F.2d 266, 270, 183 Ct.Cl. 1, 8 (1968); McCallin v. United States, 180 Ct.Cl. 220, 233–234 (1967); Sofranoff v. United States, 165 Ct.Cl. 470, 478 (1964); Daub v. United States, 292 F.2d 895, 897–898, 154 Ct.Cl. 434, 437–438 (1961); Murray v. United States, 154 Ct.Cl. 185, 191 (1961); Newman v. United States, 143 Ct.Cl. 784, 794 (1958); Watson v. United States, 162 F.Supp. 755, 757, 142 Ct.Cl. 749, 754 (1958); see Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). I feel that, in this case, the Government, in refusing to give plaintiff a salary comparable to his last earned rate, failed to abide by its regulations. To allow an agency to ignore its regulations, in the handling of its employees (no matter what the circumstances), is not only contrary to past decisions of this and other courts, but is a denial of individual rights accorded to employees and flies in the face of all that seems just and fair.