**Trevor A. WALDRON, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 604, Docket 92–4021.**

United States Court of Appeals, Second Circuit.

Argued Nov. 24, 1992.

Decided May 19, 1993.

72

Joshua D. Rievman, New York, N.Y. (Douglas F. Broder, Coudert Bros., of counsel), for petitioner.

Diogenes P. Kekatos, Asst. U.S. Atty., New York, N.Y. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Gabriel W. Gorenstein, Asst. U.S. Atty., James A. O'Brien, III, Special Asst. U.S. Atty., of counsel), for respondent.

Before PIERCE, MINER and WALKER, Circuit Judges.

PIERCE, Circuit Judge:

Petitioner seeks to have this Court review a decision of the Board of Immigration Appeals (the "BIA" or the "Board"), which upheld a decision of an immigration judge ("IJ"), which, in turn, found petitioner deportable because of two drug convictions and also denied his applications for suspension of deportation and registry. For the reasons set forth below, the petition for review is granted; the decision of the BIA is reversed; the deportation order is vacated; and the matter is remanded to the Immigration and Naturalization Service (the "INS") for further proceedings.

## BACKGROUND

In April 1970, Waldron, a native of Trinidad and a citizen of Trinidad and Tobago, entered the United States at Charlotte Amalie, in the United States Virgin Islands. It is unclear whether he entered with inspection. In April 1985, while Waldron was serving a prison sentence at the Fishkill Correctional Facility, the INS served him with an Order to Show Cause and Notice of Hearing, alleging that he had entered the United States without inspection, and charging him as deportable from the United States under § 241(a)(2) of the Immigration and Nationality Act of 1952 (the "Act"), 8 U.S.C. § 1251(a)(2) (1988). The INS subsequently lodged a Notice of Additional Charges of Deportability under § 241(a)(11) of the Act, 8 U.S.C. § 1251(a)(11) (1988), alleging that Waldron had been convicted twice of possession of marijuana.[1]

Waldron's first deportation hearing was held on July 19, 1988,[2] before an IJ. Waldron appeared *pro se*, although he was reminded at the start of the proceedings by the IJ of his right to be represented by counsel. Waldron testified that he was currently incarcerated for a weapons possession conviction. He offered various reasons why he should not be deported and asked the IJ to allow him to remain in the United States because he had family in this country. Counsel for the INS then read into the record Waldron's criminal record. In an oral decision, the IJ determined that Waldron was deportable. The IJ also determined that, due to Waldron's criminal convictions, he was ineligible for any relief under the Act, specifically, suspension of deportation and registry, because he was unable to demonstrate "good moral character," as required by § 244[3] and § 249,[4] respectively.

Waldron, proceeding *pro se*, appealed from the IJ's decision to the BIA, arguing that he had not been afforded a fair hearing. On October 16, 1990, the BIA issued its decision. The BIA stated that, since it was unable to

---

1. Sections 241(a)(2) and (11) of the Act provided in pertinent part:

   Any alien in the United States ... shall, upon the order of the Attorney General, be deported who—

   ....

   (2) entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or in violation of any other law of the United States;

   ....

   (11) ... has been convicted of a violation of ... any law ... relating to a controlled substance (as defined in section 802 of title 21)[.]

   ....

   8 U.S.C. §§ 1251(a)(2) and (11) (1988). With respect to deportation proceedings for which notice has been furnished to an alien on or after March 1, 1991, these sections have been amended and recodified, without material effect. *See* The Immigration Act of 1990, Pub.L. No. 101–649, §§ 602(a) and (d), 104 Stat. 4978, 5077–80, 5082 (1990) (codified as amended in 8 U.S.C. §§ 1251(a)(1)(B) and 1251(a)(2)(B)(i) (Supp. II 1990)). Because deportation proceedings were instituted against Waldron before March 1, 1991, 8 U.S.C. §§ 1251(a)(2) and (11) (1988) apply here.

   The term "controlled substance," as defined in the Controlled Substance Act, includes marijuana. 21 U.S.C. §§ 802(6) and 812 (Schedule I(c)(10)) (1988).

2. Although the transcript and oral decision of this hearing are dated May 19, 1988, the BIA indicated in its October 16, 1990 decision that this was erroneous and that the hearing and decision were concluded on July 19, 1988.

3. Section 244(a) of the Act provides, in pertinent part:

   As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien ... who applies to the Attorney General for suspension of deportation and—

   (2) ... has been physically present in the United States for a continuous period of not less than ten years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character....

   8 U.S.C. § 1254(a)(2) (Supp. II 1990).

4. Section 249 allows the Attorney General, in the exercise of his discretion to make a record of lawful admission for permanent residence in the case of any alien who establishes that he:

   (a) entered the United States prior to January 1, 1972;

   (b) has had his residence in the United States continuously since such entry;

   (c) is a person of good moral character; and

   (d) is not ineligible to [sic] citizenship.

   8 U.S.C. § 1259 (Supp. II 1990).

determine from the record when the additional written factual allegations had been served on Waldron and whether he was advised, at that time, of his right to counsel, it could not ascertain if Waldron had made a knowing and intelligent waiver of his right to counsel and whether he should have been afforded additional time to meet the newly lodged factual allegations and charges. The BIA also noted that Waldron had not been given a proper opportunity to designate a country of deportation. Accordingly, further proceedings were ordered. In addition, the BIA directed that in the event the decision on remand was adverse to Waldron, an appropriate order should be entered and the record certified to the BIA for review.

A second deportation hearing was held on January 31, 1991 at the Downstate Correctional Facility in Fishkill, New York, where Waldron was incarcerated. Once again, Waldron appeared *pro se*. He was served anew with the INS's Order to Show Cause and Notice of Additional Charges of Deportability, which lodged additional grounds of deportability against Waldron based upon his two marijuana convictions. Since Waldron indicated his desire to be represented by counsel, the hearing was adjourned to allow him the opportunity to obtain an attorney. The hearing resumed on March 14, 1991, but was again adjourned because Waldron had been unable to secure counsel.

Eventually, Waldron obtained legal representation and on July 11, 1991, the hearing resumed. The INS did not pursue the charge that Waldron entered the country without inspection. Instead, the INS relied on Waldron's two marijuana convictions as the basis for deporting him. Waldron contested those convictions, at one point claiming that he could not recall whether he had been convicted, and at another point stating that he refused to "concede" the charges. The IJ, relying upon two court convictions in conjunction with Waldron's "rap sheet," de-

termined that Waldron's deportability had been established under § 241(a)(11) of the Act. Waldron designated the United Kingdom as the country of deportation. Waldron then applied for a suspension of deportation, pursuant to § 244, registry, pursuant to § 249, and an adjustment of status, pursuant to § 245.[5] However, because Waldron had been incarcerated continuously since April 1987 for criminal possession of a weapon, the IJ determined that Waldron was ineligible for registry and suspension of deportation relief because he was unable to demonstrate ten years of "good moral character." Moreover, according to the IJ, Waldron was ineligible to receive an adjustment in status because of his two marijuana convictions. Accordingly, Waldron was ordered deported from the United States.

Waldron, proceeding *pro se*, again appealed the IJ's decision to the BIA, this time alleging, *inter alia*, that the INS and the IJ abused their discretion by not notifying him of his right to contact diplomatic officials of his native Trinidad and, by failing to certify his case to the BIA as directed by the BIA in its October 16, 1990 decision. On January 14, 1992, the BIA issued its decision dismissing the appeal. The BIA rejected all the grounds asserted by Waldron. With respect to the alleged failure of the INS and the IJ to notify Waldron of his right to contact consular authorities, the BIA concluded that since Waldron had failed to demonstrate that the preparation of his defense to the deportation charges had been prejudiced, he was not entitled to any relief. The Board further noted, in a footnote, that the failure to certify the case to it, as ordered by its October 16, 1990 decision, was harmless error. Finally, the BIA agreed with the IJ's conclusion that Waldron was not entitled to any relief under the Act because his continuous incarceration

---

**5.** Section 245(a) provides:

The status of an alien who was inspected and admitted or paroled into the United States may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed.

8 U.S.C. § 1255(a) (Supp. II 1990).

rendered him unable to demonstrate the requisite "good moral character."[6]

Waldron now petitions this Court to review the BIA's decision.

## DISCUSSION

On appeal, Waldron contends that a reversal of the BIA's decision is mandated under this Court's decision in *Montilla v. INS*, 926 F.2d 162 (2d Cir.1991), because the INS failed to follow its own regulations. The INS contends that a new hearing is not warranted because neither of the INS regulations in question, namely, 8 C.F.R. § 242.2(g), entitled "Privilege of communication," and 8 C.F.R. § 3.7, entitled "Notice of certification," apply to Waldron.[7] In the alternative, the INS argues that *Montilla* is easily distinguishable from the facts herein, and that, in any event, *Montilla's* broad language should be limited.

I. *Application of Regulations to Waldron*

■ Section 242.2(g) provides in pertinent part:

> Every detained alien shall be notified that he may communicate with the consular or diplomatic officers of the country of his nationality in the United States. Existing treaties require immediate communication with appropriate consular or diplomatic officers whenever nationals of the following countries are detained in exclusion or expulsion proceedings, whether or not requested by the alien, and, in fact, even if the alien requests that no communication be undertaken in his behalf[.][8]

The INS contends that § 242.2(g) cannot be interpreted as affording aliens, detained by authorities other than the INS, the right to notification of the privilege to contact diplomatic consular officials. Since Waldron was serving a criminal sentence in the custody of New York State at the time of his deportation proceedings, he was not, according to the INS, in the INS's apprehension, custody or detention and therefore the INS was not obligated to notify Waldron of his right to contact consular or diplomatic authorities of his native Trinidad and Tobago. In support of this position, the INS relies on two cases, *Severino v. Thornburgh*, 778 F.Supp. 5 (S.D.N.Y.1991) and *Fernandez–Collado v. INS*, 644 F.Supp. 741 (D.Conn.1986), *aff'd without opinion*, 857 F.2d 1461 (2d Cir.1987).

However, the INS's reliance on these cases is misplaced. In both *Severino* and *Fernandez–Collado*, the petitioners were incarcerated prisoners against whom detainers had been lodged by the INS, indicating that their convictions might subject them to deportation. Both petitioners sought writs of habeas corpus under 28 U.S.C. § 2241 to have the INS detainers removed. *See Severino*, 778 F.Supp. at 6; *Fernandez–Collado*, 644 F.Supp. at 742. Both courts found that the mere lodging of a detainer did not vest the INS with the requisite physical custody necessary to grant the habeas corpus relief. *Severino*, 778 F.Supp. at 6; *Fernandez–Collado*, 644 F.Supp. at 743–44. As the district court in *Fernandez–Collado* noted, a detainer is "merely a method of advising the prison officials to notify the I.N.S. of the petitioner's [impending] release or transfer.... The detainer expresses only the intention of the I.N.S. to make a determination of deportability[,] if and when[,] the subject of the notice becomes available at a later time." *Id.* at 743 n. 1.

Similarly, in *Campillo v. Sullivan*, 853 F.2d 593 (8th Cir.1988), *cert. denied*, 490 U.S. 1082, 109 S.Ct. 2105, 104 L.Ed.2d 666 (1989), a prisoner against whom the INS had lodged a detainer sought habeas corpus relief to compel an immediate hearing and disposition of the deportation proceeding. The Eighth Circuit held that the "detainer ... does not purport to effect [sic] Campillo's status as a

---

**6.** According to the BIA decision, Waldron did not appeal from the IJ's conclusions with respect to Waldron's application for adjustment in status under § 245 of the Act.

**7.** As an initial matter, the INS contends that Waldron's claim under 8 C.F.R. § 242.2(g) is not properly before this Court because it was not raised until Waldron's second appeal to the BIA.

We disagree. While it is true that Waldron first raised this issue in his second appeal to the BIA, the BIA addressed the issue in that appeal, apparently excusing Waldron's failure to raise the issue previously. Accordingly, we may also consider the issue.

**8.** Trinidad and Tobago is one of the listed countries. *See* 8 C.F.R. § 242.2(g).

sentenced federal offender, but merely notifies prison officials that a decision regarding his deportation will be made by the INS at some future date." *Id.* at 595. Accordingly, the lodging of a detainer with prison officials did not amount to a taking into custody, technical or otherwise, of the petitioner. *Id.* at 596; *see also Roldan v. Racette,* 984 F.2d 85, 87–88 (2d Cir.1993) (collecting cases).

However, both *Campillo* and *Fernandez–Collado* explicitly drew a distinction from *Chung Young Chew v. Boyd,* 309 F.2d 857, 865 (9th Cir.1962) and *Slavik v. Miller,* 89 F.Supp. 575, 576 (W.D.Pa.), *aff'd,* 184 F.2d 575 (3d Cir.1950), *cert. denied,* 340 U.S. 955, 71 S.Ct. 566, 95 L.Ed. 688 (1951), two cases in which the INS was deemed to have "technical custody" over petitioners. *See Campillo,* 853 F.2d at 596; *Fernandez–Collado,* 644 F.Supp. at 743. What sets *Campillo, Severino* and *Fernandez–Collado* apart from *Chung Young Chew* and *Slavik* is that, in the former cases, although the INS lodged detainers against the respective prisoners, it had not commenced deportation proceedings. In sharp contrast, in *Chung Young Chew* and *Slavik,* the INS issued warrants for the arrest of the prisoners (which was a jurisdictional prerequisite to deportation proceedings at the times involved in these cases, *see Johns v. Department of Justice,* 653 F.2d 884, 889 n. 7 (5th Cir.1981)), held deportation proceedings and made determinations of deportability, and filed detainers that, in contrast to detainers under current practice, *required* the deportees to be turned over to INS custody for deportation—all while the petitioners were incarcerated by an authority other than the INS. *See Chung Young Chew,* 309 F.2d at 859; *Slavik,* 89 F.Supp. at 576.

Herein, by relying on *Severino* and *Fernandez–Collado,* the INS implicitly argues that Waldron was no more in the INS's custody than were the *Severino* and *Fernandez–Collado* petitioners. We find this position untenable. Clearly, the extent of the INS's custody over Waldron was greater than in cases where the INS merely files a detainer requesting that it be notified when the prisoner is about to be released. Had the INS taken physical custody of Waldron

upon his release and held deportation proceedings, he undeniably would have been a detained alien and his right to be informed of the privilege to consult with the consular authorities of his country would have been triggered. We see no reason why the INS should be able to circumvent Waldron's rights simply by holding deportation proceedings in the state prison where he is incarcerated and claiming that he is not in INS custody. Waldron's need to know of his right to seek assistance from the consular authorities of his country before being deported does not vary according to the authority that detains him at the time deportation proceedings are held. We therefore hold that whenever a deportation proceeding is held with respect to an incarcerated individual, he will be deemed to be a detained alien for purposes of § 242.2(g). Waldron therefore clearly falls within § 242.2(g).

■ Also at issue in this case is 8 C.F.R. § 3.7, which provides in pertinent part:

Whenever in accordance with the provisions of § 3.1(c), a case is required to be certified to the Board, the alien or other party affected shall be given notice of certification. A case shall be certified only after an initial decision has been made and before an appeal has been taken. If it is known at the time the initial decision is made that the case will be certified, the notice of certification shall be included in such decision and no further notice of certification shall be required.... [T]he notice shall inform the party affected that the case is required to be certified to the Board and that he or she has the right to make representation before the Board, including the making of a request for oral argument and the submission of a brief.... The case shall be certified and forwarded to the Board by the Service office or Office of the Immigration Judge having administrative jurisdiction over the case upon receipt of the brief, or upon the expiration of the time within which the brief may be submitted, or upon receipt of a written waiver of the right to submit a brief.

Section 3.1(c) provides that "[t]he Commissioner, or any other duly authorized officer of

the Service, any Immigration Judge, or the Board may ... require certification ... to the Board [of cases arising under the Board's appellate jurisdiction]."

The INS argues that Waldron's claim under § 3.7 is without merit because that provision only applies to cases in which no appeal has been taken and the time specified for filing a notice of appeal has expired. Since Waldron timely appealed from the IJ's second decision to the BIA, the INS argues that § 3.7 does not apply to him.

We think the INS views § 3.7 too narrowly. Section 3.7, in conjunction with § 3.1(c), permits the BIA to reach a meritorious question presented by an untimely or otherwise questionable appeal by taking the case by certification. *See Garcia v. Boldin*, 691 F.2d 1172, 1181 n. 17 (5th Cir.1982). By its very terms, though, § 3.7 also applies to cases in which it is *known*, at the time an initial decision is made by an IJ, that the case is to be certified. Such was the case herein. In its October 16, 1990 decision, the BIA directed that "[s]hould a decision on remand be adverse to [Waldron], an appropriate order *shall be entered* and the record *shall be certified* to us for review." (emphasis added). There can be no doubt that the decision on remand was adverse to Waldron as he was ordered deported and was denied any relief from the deportation order. Therefore, as quoted above, § 3.7's provision that "[i]f it is known at the time the initial decision is made that the case will be certified [to the BIA for review], the notice of certification shall be included in such decision..." became applicable to Waldron. The mere fact that, *after* the decision was delivered without the notice of certification, Waldron salvaged the situation and filed a timely appeal did not lessen the applicability of § 3.7 to Waldron.

Accordingly, we now turn to the underlying merits of Waldron's claims.

## II. *The* Montilla *Precedent*

■ Next, the INS argues that even if § 242.2(g) and § 3.7 apply to Waldron, and even if the IJ failed to comply with these regulations, Waldron is not entitled to any relief because he is required to demonstrate prejudice from the failure to comply with INS regulations. However, in *Montilla v. INS*, we rejected the "prejudice" standard set forth in *United States v. Calderon–Medina*, 591 F.2d 529 (9th Cir.1979), and held that an alien who claims that the INS failed to adhere to its own regulations in a deportation hearing was not required to show prejudice before the alien was entitled to relief. *Montilla*, 926 F.2d at 167–69. "All that need be shown is that the subject regulations were for the alien's benefit and that the INS failed to adhere to them." *Id.* at 169.

Nevertheless, the INS argues that the instant case is distinguishable from *Montilla* because *Montilla* dealt with the right to counsel, a fundamental right derived from the sixth amendment right to counsel in criminal cases and the fifth amendment right to due process in civil cases, and enshrined in § 292 of the Act, 8 U.S.C. § 1362. When a regulation is mandated by the Constitution or federal law, the INS maintains, a court's duty to enforce the regulation is "most evident." *United States v. Caceres*, 440 U.S. 741, 749, 99 S.Ct. 1465, 1470, 59 L.Ed.2d 733 (1979). In the instant case, the INS contends, the privilege of communication with consular officials, and the certification of one's case, are merely creatures of agency regulations. Therefore, the argument goes, Waldron should be required to establish that prejudice resulted from the INS's failure to comply with its own regulations.

The INS concedes that *Montilla* sets forth a broad rule requiring remand whenever any regulation "for the benefit" of the alien is violated. However, the INS argues that this Court should limit that broad language because the *Montilla* panel "erroneously adopted an absolute 'no prejudice' standard." Instead, the INS urges this Court to adopt the standard set forth by the Ninth Circuit in *Calderon–Medina*. Under *Calderon–Medina*, a "[v]iolation of a regulation renders a deportation unlawful only if the violation prejudiced interests of the alien which were protected by the regulation." 591 F.2d at 531.

We reject the INS's argument. In the first place, there is no indication in *Montilla*

that its holding was limited to constitutional or federal statutory rights. Indeed, we note that although *Calderon–Medina* also involved the privilege to contact consular authorities under § 242.2, the majority in *Montilla* did not distinguish *Calderon–Medina* on that ground, as it readily could have if the distinction was of some importance. Rather, *Montilla* merely requires that the Court ascertain whether the subject regulations were for the alien's benefit, and if so, to determine if the INS failed to adhere to them. 926 F.2d at 169.

Moreover, we see no reason to limit the broad language in *Montilla*. *Montilla* was premised upon fundamental notions of fair play underlying the concept of due process. *Id.* at 167–69. In addition, *Montilla* set forth a number of practical reasons for adopting the "no prejudice" standard. In particular, *Montilla* remarked that remanding cases for agency compliance with its own rules actively encourages such compliance. Furthermore, a remand leaves the merits of the petitioner's claims with the "wisdom and expertise" of the INS, while the "prejudice" standard forces the appellate court "to decide whether in hindsight the positives [in petitioner's case] might so outweigh the negatives as to succeed in altering the result reached by the INS." *Id.* at 169.

 Accordingly, we turn to the application of *Montilla's* two-pronged test. Applying the first prong to the instant case, we conclude that both § 242.2(g) and § 3.7 are regulations for the benefit of aliens. Section 242.2(g) was adopted to ensure compliance with the Vienna Convention on Consular Relations (the "Convention"). *See Calderon–Medina,* 591 F.2d at 531 n. 6. Article 36 of the Convention provides that aliens shall have the freedom to communicate with consular authorities of their native country and that all aliens arrested or in detention be given notice of this right. *See* 115 Cong. Rec. 30,945, 30,948 (1969). Contact with consular authorities confers a number of benefits upon aliens, including, under Article 5 of the Convention, "representing or arranging appropriate representation ... before the tribunals and other authorities of the receiving State...." *Id.* at 30,946. The very title of

§ 242.2(g)—"Privilege of communication"—is evidence that the INS considers the regulation a benefit granted to aliens. Indeed, the regulation states that immediate communication must be made with the appropriate consular authorities whether or not requested by an alien, and, in fact, even if the alien requests that no communication be undertaken in his behalf. 8 C.F.R. § 242.2(g).

Similarly, § 3.7 is also for the alien's benefit because when a record is certified, notice of such certification must be given to the alien, along with notice that "he or she has the right to make representation before the Board, including the making of a request for oral argument and the submission of a brief." 8 C.F.R. § 3.7. Thus, by its clear language, the regulation is directed toward ensuring that aliens are aware of their right to participate in the BIA proceedings.

 Turning to *Montilla's* second prong, the record is clear that the INS did not adhere to either of these regulations. The BIA noted that the INS had failed to advise Waldron of his right to consult the consular authorities of his native country, Trinidad and Tobago. Section 3.7 requires that the IJ include a notice of certification in the decision if it is known at the time the decision is made that the decision is to be certified. The IJ knew that the BIA had ordered the record certified to it if a finding adverse to Waldron was made on remand. The IJ did not do so, as the BIA noted, thus violating both § 3.7 and the BIA's October 16, 1990 directive. Accordingly, we are constrained to remand the matter for further proceedings.

### CONCLUSION

The petition for review is granted. The decision of the BIA is reversed, Waldron's deportation order is vacated and the matter is remanded to the INS for further proceedings.