**Yorie VON KAHL, Petitioner,**

v.

**Edward J. BRENNAN, Respondent.**

**Civ. A. No. 1:CV–93–1266.**

United States District Court,
M.D. Pennsylvania.

May 27, 1994.

Frazier Marks, Joseph Uhl Metz, Paul J. Killion, Killion & Metz, Harrisburg, PA, for petitioner.

Robert J. DeSousa, U.S. Attorney's Office, Lewisburg, PA, for respondent.

## MEMORANDUM

RAMBO, Chief Judge.

Before the court is a petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2241. The petition has been fully briefed and is ripe for consideration.

### Background

At the time of the incident that is the subject of the instant petition, Petitioner, Yorie Von Kahl, was an inmate at the United States Penitentiary at Lewisburg, Pennsylvania (USP–Lewisburg).[1] Petitioner states that on December 31, 1992 he received a disciplinary infraction from USP–Lewisburg officials, charging him with possession of a sharpened instrument. Following a January 12, 1993 prison disciplinary board hearing, Petitioner was found guilty of the charge and sanctioned to a term of thirty days in administrative segregation and forfeiture of thirty days statutory good time credits.

Kahl claims that he was denied due process during the administrative misconduct proceedings because the penitentiary officials: (1) did not provide him with adequate notice of the charge; (2) failed to appoint an appropriate investigating officer and conduct an adequate investigation; (3) improperly placed him in administrative detention; (4) refused to allow him an opportunity to call witnesses; and (5) failed to meet their burden of proof during his hearing. Petitioner also claims that he received ineffective assis-

tance from a prison staff representative. Petitioner seeks to have the disciplinary charge expunged from his record and to have his forfeited good time credits restored.

Respondent asserts that the habeas petition should be denied since Petitioner did not fully exhaust his administrative remedies. Alternatively, he argues that Petitioner's claims lack merit. The court will discuss Respondent's arguments *seriatim.*

### Discussion

#### I. Exhaustion

█ The Bureau of Prisons (BOP) has established a multi-tier system whereby a federal inmate "may seek formal review of a complaint which relates to any aspect of his imprisonment." *See* 28 C.F.R. §§ 542.10–542.16 (1987). If an inmate is dissatisfied with the outcome of a disciplinary hearing, he may file an appeal to the BOP's Regional Director. An inmate who is displeased with the Regional Director's decision may file an appeal with the General Counsel. The parties do not dispute that Petitioner filed timely, unsuccessful appeals with both the Regional Director and the General Counsel following the outcome of his disciplinary hearing.

However, Respondent argues that Petitioner raised only one of his present claims in the appropriate administrative forum. Since the BOP was not afforded an opportunity to review the other purported errors alleged to have occurred during Petitioner's disciplinary hearing, Respondent insists that his instant petition should be dismissed as premature.

Petitioner acknowledges that his *pro se* appeal to the Regional Director contained only one of the claims in the case at bar. However, after filing a *pro se* appeal to the General Counsel, Petitioner, with the assistance of legal counsel, filed a supplemental brief which raised all of the instant claims. Petitioner notes that the supplemental brief was submitted on April 16, 1993, approximately two months prior to the date of the General Counsel's decision. Petitioner argues that he has exhausted his administra-

1. Petitioner subsequently was moved to USP–Leavenworth. (*See* May 6, 1994 letter from Peti- tioner's counsel to court.)

tive remedies since each of the instant claims was presented to and reviewed on the merits by the General Counsel.

As indicated above, it is undisputed that Petitioner failed to present all of his instant claims to the Regional Director. However, all of his claims were raised in the subsequent appeal to General Counsel and apparently were addressed on the merits. Thus, it would be futile to require Petitioner to file a new administrative appeal to the Regional Director containing claims which already have been denied by a higher tribunal, i.e., the General Counsel. Furthermore, at this point, an appeal to the Regional Director most likely would be dismissed as untimely. *See* 28 C.F.R. §§ 542.13(b), 542.15. Therefore, this court rejects Respondent's exhaustion argument and will review the merits of Petitioner's allegations.

## II. *The Merits of Petitioner's Claims*

Petitioner argues that he was not afforded due process in the disciplinary proceedings in several respects. Though all of his claims ultimately lack merit, Petitioner has raised some complex legal issues. As will be discussed in greater detail below, the affidavits and briefs in support and opposition to the instant petition raise several factual disputes.[2] However, this court is persuaded that, when viewed in light of the proper legal standards, these factual disputes are not material and do not preclude disposition of the instant petition without an evidentiary hearing.

This court previously summarized the basic principles of a Fifth Amendment due process analysis:

The fifth amendment of the United States Constitution provides, in part, that no person shall "be deprived of life, liberty, or property, without due process of law...." The Supreme Court has held that application of the identical provision of the fourteenth amendment requires a two-part

analysis. "We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'"

*Frankenberry v. Williams,* 677 F.Supp. 793, 795–96 (M.D.Pa.) (Rambo, J.) (quoting *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)), *aff'd without op.,* 860 F.2d 1074 (3d Cir.1988).

■ Petitioner argues that he has a due process interest in both his good time credits and in remaining in the general prison population, as opposed to being held in disciplinary or administrative segregation. This court agrees with this phase of Petitioner's argument. While the due process clause of the Constitution does not create such liberty interests, *see Wolff v. McDonnell,* 418 U.S. 539, 556–57, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1974), the relevant federal statutes and regulations do create such an interest. *See Young v. Kann,* 926 F.2d 1396, 1399 (3d Cir.1991) (a federal prisoner "has a constitutionally protected liberty interest in good time credit"); *Frankenberry,* 677 F.Supp. at 796 (federal regulations provide an inmate with a liberty interest in remaining in general prison population and in accumulating good time credits). Thus, the court agrees with Petitioner's general premise that his disciplinary hearing had to comply with due process; where the court disagrees with Petitioner is regarding exactly what process was due in his disciplinary proceedings.

The seminal case detailing "what procedures constitute 'due process of law'" in the context of prison disciplinary proceedings is *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In *Wolff,* the United States Supreme Court stated that, even where an inmate has a constitutionally protected liberty interest in good time credits, prison disciplinary proceedings in which those credits may be taken away need not

2. Ordinarily, this court would be reluctant to reach questions of a constitutional nature if the matter might be resolved on the basis of factual findings made after an evidentiary hearing. However, in this case, the court has been advised that Petitioner has been transferred out-of-state.

Thus, it would be a significant waste of resources to require transport of the prisoner back to the district for a factual hearing if Petitioner could not prevail even if the facts were found in his favor.

afford an inmate the full panoply of rights afforded to a defendant in a criminal prosecution. *Id.* at 556–57, 94 S.Ct. at 2974–75. "[O]ne cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a [ ] prison." *Id.* at 560, 94 S.Ct. at 2977. Rather, a prisoner is entitled to only those procedures necessary to assure that his protected interest "is not arbitrarily abrogated." *Id.* at 557, 94 S.Ct. at 2975.

In *Wolff,* the Supreme Court stated that an inmate subject to a prison disciplinary proceeding must be afforded the following five due process safeguards: (1) the right to appear before an impartial decision-making body; (2) written notice of the charges 24 hours in advance of the disciplinary hearing; (3) an opportunity to call witnesses and present documentary evidence, provided the presentation of such does not threaten institutional safety or correctional goals; (4) assistance from an inmate representative if the charged inmate is illiterate or if complex issues are involved; and (5) a written decision by the factfinder as to the evidence relied upon and the rationale behind the disciplinary action. *Id.* at 563–72, 94 S.Ct. at 2978–82. Subsequently, the Supreme Court also has required that there be "some evidence" which supports the disciplinary tribunal's conclusion. *Superintendent, Massachusetts Correctional Institution v. Hill,* 472 U.S. 445, 453–56, 105 S.Ct. 2768, 2772–75, 86 L.Ed.2d 356 (1985).

Since *Wolff,* the Federal Bureau of Prisons has established various regulations detailing standards and procedures for the conduct of inmate disciplinary proceedings. *See* 28 C.F.R. § 541.2 *et seq.* While the regulations substantially track the procedures outlined in *Wolff, Young,* 926 F.2d at 1404 ("the procedures codified at 28 C.F.R. 5 541.10–541.20 largely track the due process requirements established in *Wolff*"); *Frankenberry,* 677 F.Supp. at 796 (same), in some respects they go beyond what the due process clause itself requires. These due process requirements

and the applicable federal regulations form the backdrop against which Petitioner's claims must be analyzed.

### A. *Ineffective Notice*

■ Petitioner claims that he received ineffective notice of the disciplinary charge against him. Specifically, Petitioner states that he was "handed a copy of the Incident Report without more" moments before he was placed in administrative detention. (Supp. Br. of Pet'r at 13.) [3] In context, Petitioner's claim that the notice provided him was inadequate is clearly unpersuasive.

First, Petitioner clearly was aware of the precise nature and basis for the charges against him. The disciplinary charges against Petitioner resulted from a shakedown search of his cell conducted by Security Officer Gary Orwig at approximately 6:25 p.m. on December 29, 1992. Orwig "confronted Mr. Kahl with his accusation of possession" of the metal object. (Supp. Br. at 2.) It is undisputed that at 7:50 p.m. on the evening of the incident, Lieutenant Hernandez handed Petitioner a written copy of the incident report. (*Id.*) Petitioner concedes that at the same time Hernandez showed him a photocopy of the metal object alleged to be in Petitioner's locker. (*Id.*) Approximately 36 hours later, Petitioner had an initial hearing before the Unit Disciplinary Committee (UDC). Nowhere does Petitioner allege that he did not know or understand the charges against him. Thus, there is no question that Petitioner had actual notice and received a written copy of the charges against him very shortly after the incident and well before his initial hearing on the charges.

Petitioner's notice claim appears even weaker in the context of the significant safeguards afforded by the various applicable prison regulations. A number of regulations establish procedures designed to afford inmates charged with disciplinary violations the notice mandated by *Wolff.* Petitioner alleges a violation of only one part of one such regulation.

**3.** Hereafter, Petitioner's brief in support of his petition will be cited as "Supp. Br." Respon-

dent's opposition brief will be cited as "Opp. Br."

The regulation establishing the procedures which must be followed in initial hearings before a UDC has a rather stringent notice requirement:

Staff shall give each inmate charged with violating a Bureau rule a written copy of the charge(s) against the inmate, ordinarily within 24 hours of the time staff became aware of the inmate's involvement in the incident.

28 C.F.R. § 541.15(a) (1993). Since Petitioner acknowledges that he received a copy of the written charge within 24 hours of the discovery of the sharpened instrument in his cell, the requirements of § 541.15(a) were duly satisfied. Since the written copy also was provided 36 hours prior to his UDC initial hearing, there was no violation of the *Wolff* requirement that an inmate have notice of the charges twenty-four hours prior to his disciplinary hearing. 418 U.S. at 564, 94 S.Ct. at 2978–79.

Furthermore, § 541.17(a), which addresses procedures before the DHO, states:

The Warden shall give an inmate advance written notice of the charge(s) against the inmate no less than 24 hours before the inmate's appearance before the Discipline Hearing Officer unless the inmate is to be released from custody within that time. An inmate may waive in writing the 24-hour notice requirement.

Petitioner's hearing before the DHO was twelve days after his UDC hearing. Thus, Petitioner also acknowledges that prison officials adhered to the requirements of § 541.-17(a).

In spite of the foregoing, Petitioner contends that penitentiary officials violated § 541.14(b)(2)[4] and, therefore, his due process rights, because Lieutenant Hernandez did not read the charge to him or ask for his statement. Section 541.14(b)(2) states that "the investigator [ ] shall read the charge(s) to the inmate and ask for the inmate's statement concerning the incident unless it appears likely that the incident may be the subject of a criminal prosecution." 28 C.F.R. § 541.14(b)(2).

While Petitioner asserts that he was "handed a copy of the Incident Report without more," Lieutenant Hernandez contradicts this statement, at least in part, insisting that, as the investigating officer, he gave Petitioner a copy of the incident report and "made him aware of the charges and his right to make a statement or remain silent." (Opp. Br., Ex. 3 at 1, ¶ 3.) Assuming *arguendo* the facts as stated by Petitioner, this court is persuaded that the notice afforded Petitioner complied with due process.

Neither *Wolff* nor any subsequent cases cited by Petitioner specifically require that charges be read to an inmate or that an inmate be told that he has the opportunity to make a statement prior to his hearing. This is especially true where there is no allegation that Petitioner did not know or understand the charges against him or that he either made an incriminating statement that was used against him or that he was silent and that his silence was used against him. Thus, assuming *arguendo* that Respondent did not comply in every respect with the literal requirements of the regulations, this court is persuaded that the actions concededly taken by prison officials provided Petitioner with adequate notice of the charges he was facing and complied with due process.

Petitioner's only remaining argument is that, regardless of what due process may require in prison disciplinary proceedings, once the Bureau of Prisons has established certain regulations for the conduct of these proceedings, Petitioner has a right to be judged in accordance with the standards and procedures embodied in those regulations. Case law supports this proposition, though not necessarily the remedy suggested by Petitioner.

In *Marshall v. Lansing*, 839 F.2d 933 (3d Cir.1988), the Third Circuit noted that "principles of due process require an agency to follow its own regulations which have the force of law." *Id.* at 943. The court also noted that "a prisoner has a right to insure that he is being held in compliance with

---

4. In his supporting memorandum, Petitioner cites § 541.15(2), but proceeds to quote from 28 C.F.R. § 541.14(b)(2).

agency regulations which have the force of law." *Id.* This is especially true with respect to regulations adopted for the benefit of particular individuals. *See Port of Jacksonville Maritime Ad Hoc Comm., Inc. v. United States Coast Guard,* 788 F.2d 705, 708 (11th Cir.1986) (exception permitting agency limited discretion to depart from its own regulations not applicable where regulations designed to "confer a procedural benefit to a class to which complainant belongs").

However, the appropriate course of action when a violation of an agency regulation occurs is less clear. The Third Circuit has not squarely addressed the issue, though it has made some relevant, though arguably conflicting, comments in passing. In *Marshall,* on the one hand, the Third Circuit stated that "a court *can* set aside agency action that fails to comply with the agency's own regulations, at least where the regulations are designed to protect the individual grievant." 839 F.2d at 943 (emphasis added). This appears to imply that a court has some discretion regarding what to do in the context of an agency violation. On·the same page of the *Marshall* opinion, however, the court cited *United States ex rel Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), for the proposition that a "writ of habeas corpus *will issue* where [a] federal agency fails to comply with its own regulations." *Id.* (emphasis added). This appears to imply that remand is mandatory where agency regulations are violated.

The Second Circuit recently struggled with this issue in several immigration cases. *Montilla v. INS,* 926 F.2d 162 (2nd Cir.1991) (vacating deportation order and remanding because of agency's failure to strictly comply with regulations governing waiver of right to counsel); *Waldron v. INS,* 17 F.3d 511 (2nd Cir.1993) (upholding deportation order in spite of failure to comply with regulations regarding notice of right to contact consular officials), *withdrawing opinion at* 994 F.2d 71 (2nd Cir.1993). In *Montilla,* the court noted that "[w]e have two options in applying these regulations in a case where there was a failure to fully comply with them: one is to insist that they be scrupulously adhered to;

the other is to search the record to see if petitioner was prejudiced by the failure." 926 F.2d at 166. The Second Circuit referred to these options as the "*Accardi* doctrine"[5] and the "prejudice" test, respectively.

After considering the competing interests involved, the Second Circuit determined that each approach was proper in certain circumstances. Ultimately, it concluded that:

> when a regulation is promulgated to protect a fundamental right derived from the Constitution or a federal statute, and the INS fails to adhere to it, the challenged deportation proceeding is invalid and a remand to the agency is required. This may well be so even when the regulation requires more than would the specific provision of the Constitution or statute that is the source of the right. *See Montilla,* 926 F.2d at 167 (citing *Morton v. Ruiz,* 415 U.S. 199, 235 [94 S.Ct. 1055, 1074, 39 L.Ed.2d 270] (1974)). On the other hand, where an INS regulation does not affect fundamental rights derived from the Constitution or a federal statute, we believe it is best to invalidate a challenged proceeding only upon a showing of prejudice to the rights sought to be protected by the subject regulation.

*Waldron v. INS,* 17 F.3d 511, 518 (2nd Cir. 1993). Thus, the Second Circuit reversed a final order of deportation and remanded where the agency violated regulations designed to protect an alien's constitutional and statutory right to counsel, *Montilla,* 926 F.2d at 170, while it affirmed a final deportation order in a subsequent case because the regulations allegedly violated related to "less fundamental, agency-created rights and privileges." *Waldron,* 17 F.3d at 518–19.

 The Second Circuit's synthesis of the competing interests implicated in such case is instructive in several respects. First, an agency generally must comply with its own regulations, even if those regulations afford more protections than the Constitution or a particular statute may require. An individual affected by agency action generally has a right to enforce compliance with regu-

---

**5.** *See United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

lations enacted for the benefit of the individual.

■ Second, despite the foregoing general rule, an agency's failure to comply in every respect with its own regulations, even those regulations designed for the benefit and protection of the aggrieved individual, does not in every case require a remand. Rather, as the Second Circuit noted, the *Accardi* doctrine is a "judicially evolved rule ensuring fairness in administrative proceedings." *Montilla*, 926 F.2d at 168.

■ Third, to determine whether to apply this judicially evolved rule, a court must balance the relevant interests at stake in the context of the rights at issue and the proceedings under consideration. In *Montilla* and *Waldron*, the Second Circuit balanced these interests in the context of deportation proceedings. *Montilla* involved an alien's constitutionally and statutorily guaranteed right to counsel in deportation proceedings. In that case, the court adopted the *Accardi* rule because the rule (1) "would actively encourage" the agency to comply with its own regulations and (2) would promote the efficient use of scarce judicial resources. 926 F.2d at 168–69.

*Waldron* involved "less fundamental, agency-created rights," namely, an alien's right to be informed of his right to contact the consular office of his native country. After initially pushing the *Accardi/Montilla* doctrine to its furthest limits,[6] upon reconsideration, the *Waldron* court subsequently limited that doctrine to apply only to regulations affecting fundamental rights. It concluded that, with respect to less fundamental rights, "the wholesale remand of cases, where no prejudice has been shown to result from INS's failure to strictly adhere to its regulations, would place an unwarranted and potentially unworkable burden on the agency's adjudication of immigration cases." *Waldron*, 17 F.3d at 518.

The dissent would have gone further, arguing that *Montilla* itself should be overruled and that in all cases the burden should be on the alien to show prejudice before being entitled to a remand.[7] The dissent insisted that *Montilla*'s *per se* rule inevitably would lead to remands which were merely "a circuitous and wasteful route to the same result" (i.e. a final order of deportation). *Id.* at 520. In such cases, the remand would have served no purpose other than "to squander judicial and executive resources." *Id.* at 520–21.

■ In this case, the regulations at issue clearly are designed to protect an inmate's fundamental due process rights. However, because of the exigencies of the prison disciplinary context, this court is not persuaded that a disciplinary sanction must automatically be vacated and remanded because a particular regulation was violated. Rather, at least in situations where the minimal requirements of due process have been met, an inmate must show prejudice to the rights sought to be protected by the regulation claimed to be violated.

Several concerns persuade the court that this approach best balances the interests and needs of the correctional institutions and the rights of inmates. First, the Supreme Court has noted the special concerns faced by prison officials:

> In determining what is "due process" in the prison context, we are reminded that "one cannot automatically apply procedural

---

6. In an initial opinion reported at *Waldron v. INS*, 994 F.2d 71 (2nd Cir.1993), the same panel that ultimately concluded as it did in the decision reported at *Waldron v. INS*, 17 F.3d 511 (2nd Cir.1993), applied *Accardi/Montilla* approach in an across-the-board manner. The panel determined that in all cases in which an agency regulation enacted for the benefit of an aggrieved individual was violated, the agency action should be declared void and remanded for reconsideration under the proper standards and procedures. Under this rule, no showing of prejudice was required, regardless of the nature or extent of non-compliance and of the right at issue. After supplementary briefing, the panel withdrew its initial opinion, reconsidering and limiting the *Montilla* doctrine as discussed above.

7. The dissent also argued that describing the rule announced in *Montilla* as the "*Accardi* doctrine" was something of a misnomer because *Accardi* actually was a case in which prejudice clearly was demonstrated. 17 F.3d at 520 (citing *Economic Opportunity Comm'n v. Weinberger*, 524 F.2d 393, 400 n. 9 (2d Cir.1975); *McCallin v. United States*, 180 Ct.Cl. 220, 234, 1967 WL 8869 (Ct.Cl.1967)).

rules designed for free citizens in an open society ... to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff v. McDonnell,* 418 U.S. at 560 [94 S.Ct. at 2976–77]. "Prison administrators ... should be accorded wide-ranging deference in the adoption *and execution* of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (emphasis added). Recognizing these concerns, this court is reluctant to overtax and/or hamstring prison officials' execution of disciplinary policies and procedures by mandating an automatic remand for technical non-compliance with a regulation, absent some showing of prejudice to the inmate.

Second, this court is persuaded that the foregoing rule creates a proper system of incentives. On the one hand, prison officials are not given free rein to ignore applicable regulations. To the extent that the regulations in fact actually track the requirements of due process, failure to comply with them is subject to reversal and, to the extent that the requirements are based on a "clearly established" constitutional right, may even subject the non-complying officials to an action for damages. *Young,* 926 F.2d at 1404 n. 4. To the extent that regulations exceed what due process requires, a prisoner still is entitled to reversal of a sanction to the extent that he can show actual prejudice to the interests the regulation is designed to protect. Together, these factors provide a substantial incentive for officials to comply with applicable regulations.

At the same time, the rule does not discourage the promulgation of regulations and other guidelines and procedures to guide the discretion of prison officials in the conduct of prison disciplinary proceedings. One result of a hyper-technical interpretation and enforcement of administrative regulations is that it may create an incentive not to promulgate any such regulations or to repeal those in place or to revise them such that they become ineffectual. The Supreme Court recognized this concern in a slightly different context in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), when it noted that

> [t]he creation of procedural guidelines to channel the decision-making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks upon such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause.

*Id.* at 471, 103 S.Ct. at 871. The approach adopted here balances these incentives, on the one hand, encouraging officials to enact and comply with regulatory guidelines for the exercise of their discretion and, on the other hand, forgiving harmless or relatively insignificant noncompliance.

Finally, the proposed procedure adequately protects the rights of inmates. The prisoner's minimal due process rights are ensured. Further, to the extent that a regulation entitles a prisoner to more than would the due process clause itself, the inmate has an opportunity to demonstrate that he was prejudiced in a particular case because the procedure or standard was not followed.

In sum, the foregoing analysis puts the focus where it should be—on protecting the statutory and constitutional rights of the inmates—without hamstringing prison officials or forcing them to endure wasteful and pointless remands for technical errors or omissions.

■ In this case, it is clear that Petitioner is seeking to overturn the disciplinary finding against him on such a purely technical issue, where no prejudice has been shown. While conceding that he received a written copy of the incident report and that he knew the nature and basis for the charge against him, Petitioner argues that the failure to read the charge to him made his notice insufficient. Petitioner does not allege that he is illiterate and the record indicates to the contrary. Further, while Petitioner claims that Her-

nandez did not ask him for a statement, Petitioner does not allege that he could not have made a statement. He has made no showing that any statement he made or his silence was used against him in the proceedings. Accordingly, assuming *arguendo* the facts as alleged by Petitioner, he has made no showing of prejudice and his notice claim fails under the foregoing standard.

### B. *Independent Investigator*

Petitioner claims that prison officials violated § 541.11(b) and his due process rights by failing to appoint an independent investigating officer and failing to conduct an adequate investigation. Table 1 of § 541.11 sets forth the relevant procedures. in the prison disciplinary system and provides that after preparation of an incident report, there should be an "appointment of [an] investigator who conducts [an] investigation and forwards materials" to the UDC.

■ First, Petitioner's allegation that Lieutenant Hernandez was not an "independent" investigator is spurious. 28 C.F.R. § 541.2(a) defines an investigating officer as "an employee of supervisory level who conducts the investigation concerning alleged charge(s) of inmate misconduct. The Investigating Officer may not be the employee reporting the incident or one who was involved in the incident." Hernandez is a lieutenant and, thus, clearly a supervisory employee. Security Officer Gary Orwig, not Lieutenant Hernandez, was the officer who reported the incident at issue. Thus, Hernandez had no involvement in the incident and was a permissible investigator.

■ Petitioner's claims that there was no investigation of the incident at issue and that

he never received a copy of the investigator's report as he believes is required under *Young v. Kann,* 926 F.2d 1396, 1405 (3d Cir.1991), also are without merit. While Petitioner contends that *Young* entitles him to a copy of the investigation report, that case actually stands for precisely the opposite proposition. In *Young,* the Third Circuit explicitly stated that an inmate did *not* have a right to receive a copy of the investigation report. 926 F.2d at 1405 (citing 28 C.F.R. § 541.14(b)(2); *Mendoza v. Miller,* 779 F.2d 1287, 1294 (7th Cir.1985)). Rather, the court stated that if a case proceeded to a hearing before a DHO, an inmate's staff representative, if any, should at that point be provided with a copy of the investigation report. *Id.* Since there is no allegation that Petitioner's staff representative did not receive a copy of the report, this claim is meritless.

■ Petitioner's allegation that no investigation was conducted appears to be based on his contention that Hernandez was not a permissible investigator. To the extent that Petitioner disagrees with the scope of the investigation undertaken by Hernandez, it is notable that, other than his erroneous citation to *Young,* Petitioner has cited no case law in support of his argument. Finding no cases in support of Petitioner's claim, this court declines Petitioner's invitation to second-guess Hernandez's judgment regarding the scope of investigation merited by the incident [8] and, therefore, rejects Petitioner's inadequate investigation claim.

### C. *Administrative Detention*

■ Petitioner next contends that he was improperly confined in administrative detention.[9] Specifically, although he acknowledges

---

8. Petitioner's argument that the investigation was inadequate because Hernandez was required to and did not have the knife analyzed for Petitioner's fingerprints is meritless. Whether or not such tests should be conducted in a particular case is left to the discretion of prison officials; Petitioner clearly has "no constitutional right to the grant of his request for 'scientific' testing to establish non-ownership of the weapon." *Flanagan v. Warden, United States Penitentiary,* 784 F.Supp. 178, 181 (M.D.Pa.1992) (McClure, J.), *aff'd without op.,* 6 F.3d 779 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 938, 127 L.Ed.2d 229 (1994).

9. Petitioner states he was in administrative detention from December 29, 1992 until March 3, 1993. This period presumably included his prehearing confinement and service of the 30 day disciplinary segregation sanction he received. Any claim that Petitioner was kept in administrative confinement for an excessive period after he was sanctioned is irrelevant to his habeas claim because it provides no basis for reinstatement of his good time credits or for otherwise invalidating the findings of the disciplinary tribunal.

**1424**

that although prison officials had the power to place him in administrative detention, they failed to prepare a timely administrative detention order as required by § 541.22(b). Petitioner states that the administrative detention order was not drafted until two weeks after his confinement began on January 12, 1993. Additionally, he asserts that there was not a sufficient basis for his detention because there was no indication that his conduct posed a threat to prison security.

Both of these claims lack merit. Section 541.22(b) mandates that within 24 hours of an inmate's placement in administrative detention, he should receive a written copy of an administrative detention order "detailing the reasons for placing [him] in administrative detention." Attached to Lieutenant Hernandez's declaration is a copy of an administrative detention order dated December 29, 1992. (Opp.Br., Ex. 3 at 2.) The order states that Petitioner was being placed in administrative detention pending investigation into the allegation that he was in possession of a sharpened instrument and notes that a copy of the order was served on Petitioner on December 29, 1992 at 7:57 p.m. However, Petitioner denies that he received a copy of the administrative detention order at the time.

■■■ Assuming *arguendo* that Petitioner did not receive a copy of the order, his pre-hearing detention still met the requirements of due process. Where a prisoner has a liberty interest in remaining in the general prison population, he "must merely receive some notice of the charges against him and an opportunity to present his views to the official charged with deciding whether to transfer him to administrative segregation.... So long as this occurs, and the decision-maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Hewitt*, 459 U.S. at 476, 103 S.Ct. at 874. Petitioner concedes that he met with Hernandez on the evening of December 29, 1992, before Hernandez ordered him into administrative

detention. He further concedes that Hernandez gave him a copy of the incident report charging him with possession of the metal object at that time. (Reply at 7.) Petitioner does not allege that Hernandez prevented him from making a statement. Thus, Petitioner received the process that was due him under the circumstances and, even if he did not receive a copy of the detention order, there is no evidence that he was prejudiced by this omission.[10] Finally, since an inmate in possession of a sharpened instrument clearly poses a threat to institutional security, Petitioner's claim that there was no basis for his detention also is meritless.

### D. *Witnesses and Documentary Evidence*

Petitioner claims that he was denied due process because he was not permitted an opportunity to call witnesses and present documentary evidence. While generally prisoners should have an opportunity to call witnesses and present documentary evidence, the Supreme Court has noted that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence."[11] *Wolff*, 418 U.S. at 566, 94 S.Ct. at 2980; *see also Young*, 926 F.2d at 1400.

■■■ In this case, though Petitioner concedes that prior to his hearing, he executed a form indicating that he did not wish to call any witnesses, (Pet., Ex. 3), he argues that his waiver was not knowing and voluntary because he completed the form without assistance from his staff representative. However, Petitioner has not claimed he was coerced into waiving his rights. Nor has he shown that he is illiterate or has a diminished mental capacity in any respect. Indeed, Petitioner's initial *pro se* administrative appeal indi-

---

10. The record also reveals that the reviews required under 28 C.F.R. § 541.22(c) were provided. (*See* Opp. Br., Ex. 3 at 3.)

11. This requirement is codified at 28 C.F.R. § 541.17(c) which permits an inmate to call witnesses or present documentary evidence provided the evidence "does not jeopardize or threaten institutional or an inmate's security."

cates that, to the contrary, he is literate and relatively well-spoken. (*See* Pet., Ex. 7.) Furthermore, no regulation or constitutional provision requires a staff representative to be present during execution of the witness request form. Thus, there is no basis for a finding that Petitioner's waiver was not knowing and intelligent.

■ Assuming *arguendo* that Petitioner made a request to call witnesses at his DHO hearing,[12] Petitioner has shown no extraordinary circumstances which would have required prison officials to permit him to revoke his waiver in the middle of the disciplinary hearing. Petitioner concedes that the first time he requested that an opportunity to call witnesses was in the middle of the DHO hearing. No surprise at the hearing made the testimony of witnesses suddenly relevant. The charges that were the subject of the hearing clearly were known to Petitioner twelve days prior to the hearing and at the time he indicated his intent to call no witnesses. Petitioner contends that he wanted to call witnesses "who could confirm my testimony that I rarely lock my locker when absent from my cell."[13] (Supp.Br., Ex. 5 at 1, ¶ 7.) Whether or not such testimony would have been persuasive if presented, Petitioner had an opportunity to list witnesses he wished to have testify and failed to do so.

Under these circumstances, assuming arguendo that such a last-minute request to call witnesses was made, due process would not require that the request be granted. Prison officials have a substantial interest in knowing prior to the time of the hearing whether an inmate intends to call either staff or inmate witnesses. Such notice enables officials to arrange for prisoners or staff to be available at the time of the hearing. Absent a showing of surprise or other unusual circumstances, since Petitioner clearly waived his right to call witnesses prior to the hearing, prison officials did not violate due process by refusing to permit Petitioner to revoke that waiver in the middle of his hearing.

### E. Burden of Proof

■ Petitioner claims that the DHO applied an improper legal standard in determining that Petitioner was guilty of the charged offense. In the alternative, Petitioner argues that there was insufficient evidence to support the finding of guilt.

The applicable regulation provides that, "if there is conflicting evidence, [the decision of the DHO] must be based on the greater weight of the evidence." 28 C.F.R. § 541.17(f). There is absolutely no evidence before this court to show that the DHO applied the improper legal standard in this case. Further, despite the conflicting testimony, there is ample evidence in the record to support a finding that the metal object found in his locker more likely than not belonged to Petitioner. In the instant case, it is undisputed that a correctional officer prepared a written report stating that he found a nine inch sharpened metal rod in Petitioner's locked cell locker. A photostatic reproduction of the weapon was introduced and considered at the DHO hearing. In opposition to this, Petitioner testified that the weapon was not his and that he normally left his locker open. The DHO considered this evidence and concluded that Petitioner had indeed committed the charged offense. Given the substantial deference accorded the findings of prison disciplinary officials, *Young*, 926 F.2d at 1402–03, there is ample evidence in the record to support his conclusion. *See also*

---

**12.** The testimony of all other participants clearly contradicts that of Petitioner on this point. Respondent has submitted a declaration from Anthony Lupo, who was Petitioner's staff representative during the DHO hearing. Lupo states unequivocally that Petitioner never asked him "to discuss this matter with any witnesses or ask my assistance in calling witnesses at the hearing." (Opp. Br., Ex. 8, at ¶ 4.) In a similar supporting declaration, Disciplinary Hearing Officer Emory notes that during the hearing, Petitioner stated that he had no documents or any witnesses to present. (Opp. Br., Ex. 1 at ¶ 6.)

Emory also states that at no time during the hearing did Petitioner request to present any witnesses. (*Id.*) The disciplinary hearing report likewise provides that Petitioner did not ask to call any witnesses. (*Id.* at 3.) However, for purposes of the instant memorandum, the court need not determine whether such a request was made.

**13.** Petitioner has never identified any of the witnesses he claims he would have called.

*Hrbek v. Nix,* 12 F.3d 777, 781 (8th Cir.1993) (even where there is substantial evidence to the contrary, prison "disciplinary actions may be taken—and often they are—based only on a guard's [written] report").

### F. *Staff Representative*

 Petitioner's final claim is that he received ineffective assistance·from his prison staff representative. An inmate in a prison disciplinary proceeding has no constitutional right to counsel. *Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981–82. However, in cases in which an inmate is illiterate, where the issues in a particular case are extremely complex, or when other circumstances warrant it, due process may require that an inmate be permitted assistance of some sort to enable him to prepare his defense. *Id.* One of the circumstances which warrants such assistance is where an inmate's pre-hearing confinement interferes with his ability to prepare his defense. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (citing *Eng v. Coughlin,* 858 F.2d 889, 898 (2d Cir.1988)). This requirement has been codified in the BOP regulations which, in many respects, go beyond the minimum requirements of due process.

 Section 541.17(b) provides that "[t]he Warden shall provide an inmate the service of a full time staff representative to represent the inmate at the hearing before the Disciplinary Hearing should the inmate so desire." It is undisputed that Petitioner requested that Anthony Lupo, a counselor in the prison's San West unit, act as his staff representative. Petitioner's request was granted and Lupo agreed to assist Petitioner.

Lupo executed an institutional form in which he agreed to undertake *inter alia* the following duties as Petitioner's staff representative:

1. You are to assist the inmate in presenting whatever information the inmate wants to present and in preparing a defense. *This will require, in every case, consultations with the inmate,* and familiarity with the Inmate Discipline Program Statement.

2. You are to *speak to witnesses* who might furnish evidence on behalf of the inmate, *if the inmate indicates there are such witnesses whom the inmate wishes to have called.* You may question witnesses requested by the inmate who are called before the IDC.

 . . . . .

4. You should *present any evidence favorable to the inmate's defense.*

5. You should present information which may assist the IDC and which may obtain a lesser sanction for the inmate. If you believe you need additional time to pursue any of the functions, you *may request a delay in the IDC hearing* from the Chairman, but ordinarily only after you have the concurrence of the inmate to do this.

(Supp.Br., Ex. 4 (emphasis added).)

Petitioner asserts that Lupo did not assist or consult with him, failed to interview witnesses, failed to present evidence in Petitioner's favor and failed to request a continuance of the hearing. This court is not persuaded that Lupo's representation either violated Petitioner's due process rights or otherwise prejudiced him.

Three of Petitioner's contentions clearly are meritless. Petitioner's claim that Lupo failed to talk to any witnesses ignores the fact that Lupo was only obligated to speak to "witnesses whom the inmate wishes to have called." Yet, Petitioner clearly indicated that he had no intention of calling any witnesses when he signed the request for assistance. In a similar vein, the only favorable evidence that Petitioner claims Lupo failed to present was the aforementioned witness testimony. Yet, Petitioner already had indicated that he did not want any witnesses to appear at the hearing. Finally, Petitioner's claim that Lupo failed him by not requesting a continuance on his behalf also lacks merit. Assuming *arguendo* that Petitioner asked Lupo to make such a request, there is no reason to believe that prison officials would have heeded a request by Lupo any more than Petitioner's alleged request. In any event, given that the only reason for the continuance was to call the witnesses Petitioner previously

had agreed to forego, neither the applicable regulations[14] nor due process would have required that such a continuance be granted.

The one admitted breach on Lupo's part was his failure to meet with Petitioner prior to his hearing. However, the alleged prejudice to Petitioner from this breach is simply too speculative to merit relief. Petitioner would have the court believe that, if Lupo had conducted an adequate investigation, he would have unearthed evidence that Petitioner was set up. Yet, Petitioner has been out of administrative custody since March 3, 1992. Petitioner has had over two years to unearth such evidence, but as far as this court can tell, he has failed to do so. Nor is the court persuaded that Petitioner necessarily would have reconsidered his decision not to have witnesses testify in his favor if Lupo had met with him prior to the hearing. This is nothing but pure speculation.

Assuming Petitioner did reconsider and decide to call witnesses, it is far from clear that they would have made a difference. Petitioner claims that he would have called certain unidentified individuals to testify that he rarely locked his cell locker. Even if this is true, as the DHO noted in his report, Petitioner had a duty to keep his cell area from contraband. Thus, it is far from clear that a parade of witnesses testifying that Petitioner seldom locked his locker would have bolstered his case in a significant way. Thus, Petitioner has not shown any prejudice from Lupo's lapse.

Based on this court's extensive review of the pleadings, the court cannot conclude that Petitioner's due process rights were violated or that Lupo's failure to comply in every respect with the representation guidelines prejudiced Petitioner. Thus, Petitioner's final claim also is insufficient and his petition must be denied. An appropriate order will be issued.

---

14. Because the language of the staff representative duty list is permissive ("you *may* request a delay in the IDC hearing" (Supp. Br., Ex. 4, at ¶ 5 (emphasis added))), the policy guidelines did not mandate that Lupo request a continuance, but left it to his discretion.